# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2025

Lyle W. Cayce
Clerk

————————

No. 23-60495

————————

ExxonMobil Research & Engineering Company, Incorporated, *now known as* ExxonMobil Technology and Engineering Company,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

———————————————————————————

Appeal from the National Labor Relations Board
Agency Nos. 22-CA-218903,
22-CA-223073, 22-CA-232016

———————————————————————————

Before Richman, Graves, and Ramirez, *Circuit Judges*.

James E. Graves Jr., *Circuit Judge*.

ExxonMobil Technology and Engineering Company ("Exxon") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board"), finding it liable for unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The petition challenges not only the NLRB's substantive findings, but also, the vacatur of an earlier decision due to the participation of a conflicted Board member. Because we find that the Board's vacatur did not constitute an abuse of

discretion, and conclude that the Board's substantive conclusions are supported by substantial evidence, we DENY the petition for review and GRANT the NLRB's cross-petition for enforcement of its order.

## I.

Petitioner Exxon is a multinational oil and gas corporation headquartered in Texas. It operates a research facility, located in Annandale, New Jersey, that is the subject of this appeal. Approximately 165 employees at this facility are represented by the Independent Laboratory Employees Union (the "Union"). The Union has represented this bargaining unit, which primarily consists of research technicians, since the early 1940s.

A collective bargaining agreement ("CBA") that governed labor relations between Exxon and the Union expired in May 2018. In the years preceding the CBA's expiry, the parties squabbled over the company's personal time off ("PTO") policies. For example, in May 2016, the Union filed a grievance alleging that an Exxon supervisor denied an employee's PTO request in retaliation for an earlier grievance. The parties settled the matter in August 2016. Shortly thereafter, Exxon barred its supervisors from considering PTO requests, citing the possibility of inconsistent treatment. In a November 2016 grievance, the Union alleged that Exxon's PTO policy was revised in retaliation for its filing of the May 2016 grievance. The NLRB declined to pursue this allegation.

The parties began negotiating a successor labor agreement on May 7, 2018. Exxon designated manager Russell Giglio as its lead negotiator, while the Union appointed its President, Michael Myers, as its representative. Giglio, Myers, and their respective teams engaged in negotiations over 23 bargaining sessions, and reached agreement on many items. This appeal concerns negotiations over two residual issues: whether Exxon would restore the prior policy that allowed supervisors to review PTO requests

No. 23-60495

("supervisor PTO review"), and whether Union members could receive eight weeks of paid parental leave.

From the outset of negotiations, the Union made clear that it desired the restoration of supervisor PTO review. It thus offered a proposal that outlined various categories of requests (*i.e.*, "emergency," "medical," and "discretionary"), capped each category at a maximum number of hours, and delineated examples of various requests that fell within each category. Over the course of negotiations, the Union pared down its proposal to make it more palatable for Exxon. At one point, for example, the Union eliminated a separate "medical" category of requests and subsumed it entirely within a category of "discretionary" decisions.

But during the fifteenth negotiation session, on July 8, Giglio disclosed that the Union's proposal was a nonstarter for two connected reasons. First, Exxon viewed supervisors wielding discretionary authority as a recipe for "inconsistencies." Second, any inconsistencies would be used by the Union's "leadership team" to "grieve", "file [unfair labor practice allegations]," and "file lawsuits."

Giglio reiterated these objections on at least two other occasions. During a sidebar conversation[1] on July 9, Giglio informed Myers that Exxon was uninterested in restoring supervisor PTO review "because of the Union's filing of the [unfair labor practices grievance] in 2016 and it's [sic] aggressive actions." And during a September 4 bargaining session, Giglio

---

[1] A "sidebar" conversation, in the bargaining context, is a separate meeting where individual members from negotiating teams bargain privately. Comments made during a sidebar conversation may be used by the Board in determining whether an unfair labor practice transpired. *See, e.g.*, *In Re Matanuska Elec. Ass'n, Inc.*, 337 NLRB 680, 683 (2002) (NLRB adopting an ALJ's finding that "[w]hether formal or sidebar, statements of position and declarations of movement on important issues must all be considered when evaluating whether there is a likelihood of reaching an agreement.").

conceded that while Exxon previously had an "unwritten process" allowing supervisors to grant PTO requests, the practice ended when the Union "brought an unfair labor practice allegation trying [to] formalize" the policy. Giglio summarized, "[T]hat gravy train has now moved on because we have to defend ourselves." After Myers confronted Giglio on what he meant exactly, Giglio contested that "the catalyst" for the frosty relationship between Exxon and the Union was Myers assuming the role of Union President in 2014.

A second area of dispute arose over Exxon's paid parental leave policy ("PPTO"). In November 2017, Exxon announced it would provide eight weeks of PPTO to employees who were not represented by a labor union. The Union sought to extend this benefit to its members. But for at least the first four days of negotiations, Exxon declined to address the Union's request. On the fifth day, May 24, Giglio postulated that the request was not "an offer" because the Union failed to provide any specific concessions in exchange for eight weeks of PPTO. Myers countered that the entirety of the negotiations constituted a "complete package."

Eventually, on or around the fifteenth bargaining session, Myers presented a tit-for-tat proposal: in exchange for eight weeks of PPTO, the Union was willing to forego a $5,000 per-employee ratification bonus. Giglio skeptically responded, "Do you really think 144 of those people [referring to the Union's membership] would want PPTO versus $5,000 up front?" Myers confirmed that was the Union's proposal.

During the next day's bargaining session, Myers pressed Giglio on what it would "take to get eight weeks of PPTO." Giglio replied, "Walk away from the bargaining agreement." When asked to clarify his response, Giglio stated that employees who were not represented "would have eight weeks of PPTO." The Union's representatives again asked what it would

No. 23-60495

"realistically take" to receive PPTO.  Giglio demurred, stating that Exxon had already offered an "incredible and unprecedented offer" and that he "[couldn't] answer" what concessions were necessary.  Later that day, during a sidebar conversation, Giglio again suggested that employees could "go without a union" if they desired a PPTO benefit.[2]

The Union filed unfair labor practice charges against Exxon, and the NLRB's General Counsel subsequently issued an unfair labor practice complaint regarding Exxon's conduct during the 2018 CBA negotiations. After holding an evidentiary hearing, an administrative law judge ("ALJ") issued a recommended decision finding that Exxon had violated the National Labor Relations Act by (1) refusing to bargain in good faith on the supervisor PTO review issue, (2) conveying to employees that it refused to bargain on the supervisor PTO review issue in retaliation for the Union's past grievances, and (3) suggesting to employees that they would receive eight weeks of PPTO in exchange for decertifying the union.  On September 28, 2020, the Board, consisting of then-Chair John Ring and then-Members William Emanuel and Marvin Kaplan, issued a decision (the "2020

─────────────────────────

[2] In its opening brief, Exxon denies that this sidebar conversation occurred, and points to portions of Giglio's testimony that purportedly rebut Myers' recollection.  But the Board adopted the ALJ's finding that "Giglio's denial that he made the comment during the side bar was not credible given his subsequent comments on the record."  372 NLRB No. 138 at 21 n.13 (Appendix, ALJ Findings of Fact).  And we are bound by the ALJ's credibility determinations "unless one of the following factors exists: (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996) (citing *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993)); *see also NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 507 (5th Cir. 1987) (this court "must accord great deference to the credibility determinations of the ALJ, and the Board").  Exxon's challenge falls short of the magnitude necessary to disturb the Board's evidentiary conclusions regarding this piece of evidence.

No. 23-60495

Decision") that reversed the ALJ's findings and dismissed the NLRB's Complaint.  370 NLRB No. 23 (2020).

Several months after the 2020 Decision, Member Emanuel submitted a financial disclosure report that generated concerns related to potential conflicts of interest.  In May 2021, at the request of the agency's Designated Agency Ethics Official, the NLRB's independent Inspector General opened an investigation into Member Emanuel's financial holdings.  On August 21, 2021, the Inspector General issued a report concluding that Member Emanuel had improperly participated in multiple NLRB proceedings, including the one involving Exxon and the Union, in violation of 18 U.S.C. § 208(a).  In particular, the Inspector General found that "Member Emanuel's position that he lacked knowledge of the conflicting financial interest[s] [was] without merit."   The Designated Agency Ethics Official reviewed the Inspector General's report and recommended that Member Emanuel should have been disqualified from the proceedings that culminated in the 2020 Decision.

On January 7, 2022, the Board issued a Notice to Show Cause requesting briefing on whether the 2020 Decision was subject to vacatur in light of Member Emanuel's conflicted participation in the case.[3]  After receiving briefing, on August 19, 2022, a panel of the Board (Chair McFerran and Member Wilcox as the majority; Member Ring dissenting) vacated the 2020 Decision and referred the case for adjudication by a new Board panel. 371 NLRB No. 128 (2022).  Specifically, the Board concluded that vacatur

_____

[3] When the Notice to Show Cause was issued, original panel members Ring and Kaplan were joined by new Board colleagues Gwynne Wilcox, Lauren McFerran, and David Prouty.  McFerran replaced Ring as Chair.

was necessary to preserve public confidence in the integrity and impartiality of the NLRB's adjudicative process. *Id* at 2.

Subsequently, on August 25, 2023, the Board issued a new decision and order (the "2023 Decision") that affirmed the ALJ's findings regarding Exxon's refusal to bargain in good faith on the supervisor PTO review item, and refusal to bargain on the issue in retaliation for the Union's past grievances. 372 NLRB No. 138 at 8–9 (Aug. 25, 2023). The Board also concluded that Exxon unlawfully informed employees "that, at least with respect to PPTO, they were better off without being represented by the Union." *Id.* at 10.[4] The 2023 Decision ordered two remedies: first, Exxon was to cease and desist from these specific unfair labor practices, and second, Exxon was required to post a remedial notice at the New Jersey facility where Union employees work. *Id.* at 15–16.

Exxon did not seek rehearing of the 2023 Decision. It instead filed a petition for review of the Board's actions. The NLRB subsequently filed a cross-petition for enforcement of the 2023 Decision.

## II.

We have jurisdiction over Exxon's petition for review pursuant to 29 U.S.C. § 160(f), and the NLRB's cross-petition for enforcement pursuant to 29 U.S.C. § 160(e). But our review "of NLRB decisions and orders is limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). The Board's procedural decisions, such as those concerning vacatur and reconsideration, are reviewed for abuse of discretion. *Renew Home Health v. NLRB*, 95 F.4th 231, 239 (5th Cir. 2024); *see, e.g.*, *NLRB v.*

---

[4] This charge differs from the ALJ's original finding: that Exxon "offered PPTO benefits to employees on the condition that they give up or decertify the Union." This issue will be discussed later in the opinion.

*U.S.A. Polymer Corp.*, 272 F.3d 289, 296 (5th Cir. 2001) (reviewing denial of a motion for reconsideration for abuse of discretion); *NLRB v. Con-Pac, Inc.*, 509 F.2d 270, 272 (5th Cir. 1975) (concluding that "dispens[ing] with a hearing" was "not an abuse of discretion").

As for substantive rulings, the parties agree that the Board's factual findings are reviewed "under a substantial evidence standard," while its legal conclusions are reviewed de novo. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). The factual standard is a deferential bar: substantial evidence "is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). Even if this court could "justifiably [make] a different choice had the matter been before it de novo," it cannot "displace the Board's choice between two fairly conflicting views" of the evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## A.

Exxon focuses the majority of its argument on alleged administrative, procedural, and statutory violations that resulted from the Board's vacatur of the 2020 Decision. Specifically, the company avers that the NLRB lacked the authority to vacate the 2020 Decision, and alternatively, that even if the Board had vacatur authority, exercising it was an improper remedy for Member Emanuel's participation in the 2020 Decision.

### 1.

29 U.S.C. § 160(d) ("Section 10(d)" of the National Labor Relations Act) allows the NLRB to, at "any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it." The NLRB justified its vacatur of

the 2020 Decision through the exercise of its Section 10(d) authority.[5]  371 NLRB No. 128 at 2.  The statute's plain text offers only one temporal limit on this authority: the NLRB may not modify or set aside its orders once "the record in a case [is] filed in a court." 29 U.S.C. § 160(d).

Exxon first contests that the Board "improperly" used its Section 10(d) authority.  It points to the following line from *In re NLRB*, 304 U.S. 486 (1938): Section 10(d) affords the Board "an opportunity to correct errors in a court to consider new evidence which would render the order inadequate or unjust."  *Id.* at 492.  Exxon construes this quote as a limitation on Section 10(d): under its reading, the NLRB may only exercise the power "to correct mistakes, consider newly-discovered evidence, and conform orders based on subsequent changes in law."

But the very events that transpired in *In re NLRB* undermine Exxon's narrow reading.  The case concerned a 1938 policy change, enacted three years after the NLRB's creation, that allowed parties to submit briefs and request oral argument.  304 U.S. at 489.  To enforce this policy change in all of its cases, the NLRB sought to vacate its orders in "cases already decided," "restore the causes to its docket," and "reconsider and redetermine them" after providing parties with an opportunity to submit briefs and be heard.  *Id.*  These sweeping procedural actions would have been unlawful under Exxon's reading of the case, as the Board's policy change neither corrected a mistake, nor contemplated newly discovered evidence,

---

[5] Exxon remarks that 18 U.S.C. § 208(a), the statute that the NLRB concluded Member Emanuel violated, is a criminal statute that the Board is incapable of enforcing. But the NLRB's vacatur decision was grounded in its broad statutory authority to reconsider decisions; it simply referenced 18 U.S.C. § 208(a) as the violation that warranted Member Emanuel's disqualification.

nor conformed to subsequent changes in law. Yet the Supreme Court upheld the NLRB's authority to execute these purely procedural actions. *Id.*

At bottom, the plain text of Section 10(d) grants the NLRB broad authority to modify or set aside its orders. And the only textual limitation, that the authority disappears once "the record in a case [is] filed in a court," is not applicable here. 29 U.S.C. § 160(d). Exxon's attempt to transform dicta from *In re NLRB* into limitations on the Board's authority cannot be squared against by the very facts underlying the decision. Accordingly, the NLRB's vacatur of the 2020 Decision was, at minimum, based on a legitimate exercise of its statutory authority to reconsider or set aside its prior rulings.

**2.**

Exxon also contends that 28 U.S.C. § 455, titled "Disqualification of justice, judge, or magistrate judge," enumerates the principles that should have dictated the NLRB's response to the ethics concerns. But the judicial disqualification statute does not bind the NLRB's actions for at least two reasons. First, the provisions apply to "any justice, judge, or magistrate judge of the United States"—in other words, Article I or III judicial positions. 28 U.S.C. § 455. Members of the National Labor Relations Board are Article II appointees. 29 U.S.C. § 153(a). Second, the statute outlines circumstances that warrant the disqualification of a judicial official. 28 U.S.C. § 455. This case presents a different, and derivative, question: how an agency proceeds once it determines that a panel member should have refrained from participating in a since-issued adjudicative decision.

As Exxon avers, prior Board members have relied on 28 U.S.C. § 455 to guide recusal determinations. In both *Overnite Transp. Co.*, 329 NLRB 990 (1999), and *Cedars-Sinai Med. Ctr.*, 224 NLRB 626 (1976), individual NLRB members referenced the judicial disqualification statute's provisions

while explaining their respective decisions to remain on a case. But solo opinions are not binding upon the NLRB, and in any event, the cited concurrences concerned whether a Board member should have continued participating in a case's disposition. To the extent that Exxon believes that Member Emanuel's conflict did not warrant disqualification, the Board "unanimous[ly]" concluded otherwise. 371 NLRB No. 128 at 2.

Even if the judicial disqualification statute bound the NLRB's actions, Exxon's arguments are unavailing for two additional reasons. First, as to the statute itself, Member Emanuel's disqualification would be justified under 28 U.S.C. § 455(a), which requires that a judge be disqualified from "any proceeding in which his impartiality might reasonably be questioned." And second, the question of whether a member ought to be disqualified is distinct from how to remedy a proceeding that included a disqualified member. As to the latter question, the Supreme Court has explained that 28 U.S.C. § 455 "neither prescribes nor prohibits any particular remedy for a violation of that duty." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988). It is thus difficult to conclude that the NLRB abused its discretion by selecting a valid remedy (vacating the 2020 Decision and rehearing the case) instead of Exxon's preferred option (retaining the original panel opinion).

**3.**

Next, Exxon invokes res judicata, and theorizes that the NLRB's delay in vacating the 2020 Decision was "inappropriate." But res judicata is only implicated when a second, later suit involves the same parties and causes of action as a first, final suit. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). This case, by contrast, involves just one decision that was vacated—removing the finality of that decision—and then redecided.

11

One of Exxon's related arguments fares better: even if the NLRB had the authority to vacate prior decisions, it ought to have done so expeditiously in this case. The company references a pair of out-of-circuit cases for interconnected propositions: (1) reconsideration should "occur[] within a reasonable time after the first decision," *Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993), and (2) "absent unusual circumstances, the time period will be measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977).

But neither case fits the present dispute. The *Belville Mining* quote is expressly conditioned on an agency's exercise of its *inherent* authority: "[T]he general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision." 999 F.2d at 997 (citation omitted). *Mazaleski* holds the same distinction. 562 U.S. at 720 ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."). In contrast, the NLRB exercised its *statutory* Section 10(d) authority to vacate the 2020 Decision. 371 NLRB No. 128 at 2.

And even if a hypothetical test created by *Mazaleski* and *Belville Mining* applied to this case, the NLRB would have a strong argument that its delay was reasonable. It is undisputed that 16 months elapsed between the issuances of the 2020 Decision and the January 2022 Order to Show Cause. But extenuating circumstances explain the delay: the NLRB was unable to confirm the existence of Member Emanuel's conflict until, at earliest, August 2021, when the Board's independent Inspector General issued a report concluding such. The NLRB issued its Notice to Show Cause approximately five months after that report—a period of time that is arguably reasonable, given competing agency demands, and, in any event, a duration

that, consistent with *Mazaleski*, is measured "in weeks, not years." 562 F.2d at 720. [6]

Exxon also references various factors that were compiled in a law review Note penned by now-Ninth Circuit Judge Daniel Bress. In the Note, Bress surveyed federal cases that evaluated an agency's authority to reconsider its decisions. He concluded that the following seven factors were employed, though not necessarily together:

> (1) the complexity of the decision; (2) whether the decision was based on fact or law; (3) whether the agency acted according to its general procedures for review; (4) whether parties had relied upon the initial decision; (5) whether the agency acted in bad faith by advancing a pretextual explanation to justify reconsideration; (6) whether the agency provided notice of its intent to reconsider the initial decision; and (7) the probable impact of an erroneous agency decision absent reconsideration.

Daniel Bress, *Administrative Reconsideration*, 91 VA. L. REV. 1737, 1761–62 (2005). But reviewing the entirety of the Note reveals three distinguishing points. First, Bress acknowledged that there is substantial variance in what constitutes a reasonable period for reconsideration. *Id.* at 1763–64 ("Oddly, two years has held to be both reasonable and unreasonable. And while eleven months, one year, sixteen months, and three years have been held

---

[6] Exxon vaguely references a different "motion to remand" regarding Member Emanuel's financial conflicts that the NLRB filed in a D.C. Circuit appeal on October 26, 2021—eight weeks before it filed the Notice to Show Cause in this case. But the comparison is akin to apples and oranges: the extent and degree of Member Emanuel's financial conflicts in the D.C. Circuit case are not in the record. And in any event, an eight-week difference is too short to attribute the nefarious motive Exxon suggests—especially considering that the NLRB ultimately issued a Notice to Show Cause in the D.C. Circuit case *six months after* the show cause order in this dispute. *Dist. Hosp. Partners, L.P.*, 372 NLRB No. 109 (July 25, 2023) at 1 ("On July 14, 2022, the National Labor Relations Board issued a Notice to Show Cause in this proceeding.").

unreasonable, four and a half years has been deemed acceptable."). Second, the piece does not analyze financial conflicts of interest as a justification for agency reconsideration. And third, the factors are presented in a distinguishable context: "where federal courts have been unwilling to adhere to the default presumption that administrative agencies have the inherent power to reconsider." *Id.* at 1756. As mentioned earlier, the Board's vacatur decision was premised on its *statutory* Section 10(d) authority. These points, coupled with the non-binding nature of the piece itself, greatly diminish its persuasive value in resolving this matter.

**4.**

Exxon separately argues that even if Member Emanuel had a disqualifying conflict of interest, vacatur was not warranted because he was not dispositive to forming a majority opinion. Otherwise stated, Exxon posits that the NLRB should have just let the 2020 Decision stand as a 2-0 majority opinion with one recused panel member. The Supreme Court, however, has rejected this back-of-the-napkin approach as ethically improper and procedurally insufficient.

Specifically, in *Williams v. Pennsylvania*, the Supreme Court concluded that Pennsylvania Supreme Court Chief Justice Ronald Castille should have recused himself from participating in a capital appeal after previously authorizing prosecutors to seek the death penalty against the petitioner while serving as District Attorney. 579 U.S. 1, 14 (2016). Notably, the Pennsylvania Supreme Court's decision was a 6-0 unanimous dismissal, meaning that Castille's vote was not dispositive. But the *Williams* majority had "little trouble" concluding that Castille's participation was "a structural error even if the judge in question did not cast a deciding vote." *Id.* Two principles were central to this conclusion. First, because judicial deliberations are considered confidential, inquiring as to whether a conflicted

14

judge affected a panel (and if so, to what degree) is neither practical nor productive. *Id.* at 14–15. Second, "[b]oth the appearance and reality of impartial justice are necessary to the public legitimacy" of the court's work and the rule of law. *Id.* at 15–16.

These twin principles dispose of Exxon's arguments on this point. The company's pronouncement that if Members Ring or Kaplan "had any concern about whether Member Emanuel's impacted *their* decision making in the instant case, they would have so stated in the Notice to Show Cause or an ensuing Decision Order," is a speculative assumption made with incomplete information about confidential deliberations. Exxon similarly contends that vacatur was unnecessary because Member Emanuel was unaware of any conflict, and thus could not have engaged in overt and unfair conduct. Notwithstanding the fact that the independent Inspector General concluded that Member Emanuel's purported obliviousness was "without merit," the twin principles outlined in *Williams*—the impracticality of measuring a conflicted judge's influence and the need to maintain at least an appearance of impartiality—counsel against this position. 579 U.S. at 15–16. And while Exxon references the "harmless error" standard often employed to adjudicate concerns related to the judicial disqualification statute, the principle, as mentioned above, "neither proscribes nor prohibits any particular remedy" to redress a judge's disqualification from a case. *Liljeberg*, 486 U.S. at 862. For the reasons explained throughout this opinion, the NLRB was well within its discretion to vacate the 2020 Decision and rehear the case with a newly construed panel.

Exxon also points to *Hodosh v. Block Drug Co.*, which rejected the "erroneous assumption that a unanimous decision must be vacated when one member of the panel learns of a basis for his disqualification." 790 F.2d 880, 881–82 (Fed. Cir. 1986). But *Hodosh* and similar Federal Circuit cases (such as *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985)) do not mandate that

panel decisions remain unchanged despite the participation of a conflicted member. Nor do these cases compel the suggestion Exxon posited at oral argument: that a reconstituted panel should have included the non-conflicted Board members that participated in the original decision.

Lastly, Exxon claims that *Williams* is "entirely inapposite" because Chief Justice Castille's bias was "unequivocally apparent, unlike the present case where Member Emanuel did not even know of the purported financial conflict of interest." But *Williams* turned not on the *subjective* knowledge of a conflict, but rather, the *objective* appearance of bias that exists through the presence of an ethical conflict. 579 U.S. at 16 (identifying the "objective risk of actual bias on the part of a judge"). The Board was accordingly well within its discretion to conclude that vacatur was necessary to promote public confidence and preserve the integrity and impartiality—or at least the appearance of such—of its adjudicative processes.

At bottom, the Board's procedural decisions are reviewed for abuse of discretion. *Renew Home Health v. NLRB.*, 95 F.4th 231, 239 (5th Cir. 2024). Despite Exxon's repeated references to the judicial disqualification statute, the NLRB acted within its jurisdiction when it employed its Section 10(d) authority. And the Board's decision to vacate the 2020 Decision is defensible in multiple respects: it promotes public confidence in the agency's ability to issue decisions that are not tainted by ethical or financial conflicts; creates NLRB precedent that vacatur is the proper remedy when a panel member is found to have disqualifying conflicts of interest; and protects the agency from potential legal liability related to unethical decision-making. Each of these factors alone would justify vacatur of the 2020 Decision; combined, they provide a comprehensive rationale that easily clears the abuse of discretion standard that circumscribes our review.

**B.**

Separately, Exxon challenges the NLRB's two substantive findings related to its negotiations on the supervisor PTO review issue: that it refused to bargain on the issue in good faith, and it refused to bargain in retaliation for the Union's previous grievances. The Board based these conclusions on three of Giglio's statements: his July 8 remark that the Union's proposal was a nonstarter due to "inconsistencies" and the Union's use of inconsistencies to "grieve" and "file lawsuits"; his July 9 comment, made during a sidebar conversation, that Exxon was uninterested in negotiating on the issue "because of the Union's filing of the [unfair labor practices grievance]"; and his September 4 explanation that the company removed the previous supervisor PTO review policy (self-described as a "gravy train") because "[Exxon has] to defend ourselves."

Exxon raises two arguments in opposition to the Board's conclusions. First, it suggests that its position on supervisor PTO review was justified because of "pitfalls of inconsistency" associated with enforcement. But the record lacks any specificity on what "pitfalls" could occur. It merely suggests that Exxon "simply did not trust each supervisor to administer [a PTO program] in a manner in which it would avoid challenges." This vague pronouncement does not answer (1) how the issue is nonunique, given that presumably, *someone* will have to decide whether to grant an employee's PTO request,[7] or (2) why the Union's proposal, which appeared to delineate how various requests fell within preset categories, would not at least limit possible inconsistencies.

---

[7] At oral argument, neither party was able to explain how Union members' PTO requests are currently addressed.

Furthermore, Giglio's comments constitute substantial evidence that Exxon had a superseding motive for rejecting the Union's supervisor PTO review proposals: inconsistencies would lead to labor grievances. Indeed, Giglio's July 9 and September 4 comments establish that the Union's grievance activity was a but-for cause of Exxon's refusal to negotiate on the supervisor PTO review issue. In the former comment, Giglio explicitly justified the company's refusal to negotiate by pointing to past grievances involving supervisor PTO review. And in the latter comment, Giglio admitted that Exxon eliminated the supervisor PTO review policy—self-described as a "gravy train"—because the company had "to defend [itself]," ostensibly from future Union grievances.

To give Exxon the benefit of the doubt, these two concerns can be distinct issues. The company could have been wary that a discretionary policy would lead to additional Union grievances, while also being concerned that reinstating supervisor PTO review would result in inconsistent treatment among different supervisors. But Giglio's comments subsume the latter concern within the former: Exxon was concerned about inconsistent treatment *because* such inconsistencies made the company vulnerable to lawful grievance activity. That causation link, formed by Giglio's remarks, pushed Exxon's position from permissible bargaining into unlawful retaliation for prior grievance activity. *See, e.g.*, *10 Ellicott Square Ct. Corp.*, 320 NLRB 762, 772 (1996) (finding a violation of the National Labor Relations Act when an employer "condition[ed] agreement on the terms of a collective-bargaining agreement, on the Union's withdrawing unfair labor practice charges"); *In Re Mesker Door, Inc.*, 357 NLRB 591, 597 (2011) (finding that threats of retaliation for employees that filed charges had a "likely long-term effect of deterring employees from filing future charges with the Board"), *overruled in part on other grounds by Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 (Nov. 22, 2019).

Second, and separately, Exxon avers that it did bargain on the supervisor PTO review issue with the Union over multiple negotiation sessions; the parties were just unable to reach an agreement. But "merely meeting together or simply manifesting a willingness to talk does not discharge the federally imposed duty to bargain." *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43, 46 (5th Cir. 1974). Instead, parties must "meet and negotiate in a certain frame of mind – to bargain in good faith." *Id.*

Exxon's conceded position on the supervisor PTO review issue crossed the line from hard bargaining into unlawful obstruction. The company expressly based its refusal to negotiate on (1) a prior grievance the Union had filed and (2) the Union's purported propensity to file unfair labor practice allegations. Both rationales directly implicate the Union's well-protected right to file labor grievances. And because of this hardline position, Exxon refused to contemplate an alternative that the Union proposed and tweaked to address the company's concerns. The record accordingly affords substantial evidence in support of two violations that the Board assessed concerning supervisor PTO review.

## C.

Exxon also challenges the NLRB's finding that it unlawfully made coercive statements relating to PPTO. The Board based its decision on two findings: first, Exxon's initial refusal to bargain on the PPTO issue, and second, Giglio's comment that an employee desiring PPTO could simply leave the union. Again, substantial evidence supports the NLRB's decision that Giglio's comments crossed the line into unlawful territory.

Exxon offers two responses to this charge—one procedural, one substantive. On procedure, Exxon accuses the Board of performing a bait-and-switch: while the ALJ initially concluded that Exxon "offered PPTO benefits to employees on the condition that they give up or decertify the

Union," the NLRB overturned that finding and instead pressed a different charge: that Giglio informed employees "that, at least with respect to PPTO, they were better off without being represented by the Union."

But the company's argument has two fatal defects. First, a petitioner seeking review of an NLRB decision is barred, absent "extraordinary circumstances," from raising an objection that was not at least first "urged" before the Board. 29 U.S.C. § 160(e). Indeed, when presented with this exact posture (an alleged procedural due process violation that resulted from the Board's actions), the Supreme Court expressly refused to address the issue because the party "failed to file a petition for reconsideration" before the NLRB. *Int'l Ladies' Garment Workers' Union, Upper S. Dep't, AFL-CIO v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975). The same is true here: Exxon failed to file a motion for reconsideration before seeking this court's review, and is accordingly barred from raising any new procedural objections absent an extenuating circumstance.

Second, the Board is allowed to "find and remedy a violation even in the absence of a specified allegation in the complaint" if two requirements are met: "the issue is closely connected to the subject matter of the complaint," and the issue "has been fully litigated." *Pergament United Sales*, 296 NLRB 333, 334 (1989). The requirements are satisfied here: the Board's new charge, that Exxon insinuated that Union employees were better off without the Union's representation, stems from the same nucleus of operative facts as the ALJ's original recommendation. And, as the NLRB contends, "the parties fully litigated the overarching question of how employees would have understood [Giglio's] statement in the context of the parties' bargaining." Exxon's claim accordingly does not rise to an error that warrants reversal.

Turning to substance, Exxon frames Giglio's remarks as "sarcasm" and "meaningless, frustrated remark[s]" made during one of over 20 bargaining sessions. But that isolated framing obscures important context. Even though the Union sought PPTO from the outset of negotiations, Exxon's representatives refused to discuss the topic for at least the first four negotiating sessions. During the fifth negotiating session, Giglio conveyed a desire for specific consideration in exchange for the benefit. Yet when presented with just that (an offer to forfeit the $5,000-per-employee ratification bonus in exchange for the eight weeks of PPTO), Giglio immediately questioned Myers' authority to make that offer. The implicated remarks, in turn, constituted Exxon's first substantive response to the Union's proposal—and it effectively amounted to, *those who desire the benefit can simply get it by leaving the Union.*[8]

Exxon is correct that Giglio's remarks were truthful: the company provided eight weeks of PPTO to non-represented employees, and so an individual employee desiring the benefit could receive it by leaving the union. But truthful statements, when subsumed in the specific context of negotiations, can be reasonably construed as encouragement to separate from a union. *See, e.g.*, *NLRB v. Herman Sausage Co.*, 275 F.2d 229, 233–34 (5th Cir. 1960) (concluding that a truthful remark that employees would get more pay because they would not need to pay union dues, constituted "union disparagement" because it would "become a reality only if . . . the employees

---

[8] Exxon claims that the Union's representatives testified that they did not understand Giglio's bargaining session remarks "to be serious." But this misconstrues the testimony: Myers testified that it would be "ridiculous" for *Giglio* to think that *Myers* was willing to "get rid of the union and not be the president in order to get PPTO." And while Union Vice President Thomas Fredriksen testified that he laughed at Giglio's comment because it was an "absurd response," he also confirmed his understanding of the comment: "that if [the Union] didn't have a collective bargaining agreement, [he] would receive PTO."

would withdraw from the union"). And the employees that Exxon was negotiating with could have objectively viewed Giglio's remarks as sincere, given that (1) he made a similar suggestion at least one additional time that day, and (2) "frustrated remark[s]," as Exxon frames them, can evince true motivations uncovered through intense negotiations.

At bottom, both Exxon and the Board have presented justifiable interpretations of Giglio's comments. But on appeal, the standard of review for factual interpretations is substantial evidence, and accordingly, our role is restricted to evaluating whether the Board's view of the facts is reasonable. We cannot "displace the Board's choice between two fairly conflicting views" of the evidence even if we could "justifiably [make] a different choice had the matter been before [us] de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Valmont line nuIndus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (same). And the same standard applies to "plausible inferences [the NLRB] draws from the evidence." *NLRB v. Thermon Heat Tracing Serv., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998). Thus, while Exxon raises colorable arguments challenging the Board's interpretation of Giglio's comments, the NLRB's better reading is supported by substantial evidence—foreclosing reversal on appellate review.

## IV.

For the reasons discussed above, we DENY Exxon's petition for review and GRANT the Board's cross-petition for enforcement.