# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2026

Lyle W. Cayce
Clerk

No. 24-60523

Harvard Maintenance, Incorporated,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Petition for Review and Cross-Application for Enforcement of
a Decision of the National Labor Relations Board
Agency Nos. 02-CA-254451, 02-CA-258382

Before Smith, Dennis, and Richman, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Harvard Maintenance, Incorporated, employed Carina Cruz. During the process of lodging a series of complaints for purported violations of the collective bargaining agreement, Cruz faced threats by her supervisors, ultimately resulting in her termination. After her termination, she made a complaint to the National Labor Relations Board ("NLRB" or the "Board"), where an administrative law judge ("ALJ") found that Harvard Maintenance unlawfully threatened, suspended, and fired her. To remedy those violations, the ALJ required Harvard Maintenance to pay Cruz backpay, reimburse her for all "search-for-work-related expenses," and compensate her

for "any direct or foreseeable pecuniary harms incurred as the result of the unlawful discharge."

The NLRB adopted the ALJ's order, leading Harvard Maintenance to petition for review and the Board to cross-petition for enforcement. Harvard Maintenance challenges (1) the findings as to coercive statements; (2) the finding of an unlawful discharge; and (3) the remedy of "direct and foreseeable pecuniary harms suffered as a result of" the discharge. Although the NLRB's findings on Harvard Maintenance's violations of the law are supported by substantial evidence, the award of consequential damages exceeds the Board's statutory authority under the National Labor Relations Act ("NLRA"). Consequently, we deny Harvard Maintenance's request for relief as to the NLRB's findings of coercive statements and unlawful discharge, and we vacate the portion of the order awarding consequential damages.

I.

Harvard Maintenance, a New York City janitorial contractor, employed Cruz as a cleaner. On January 3, 2020, Cruz complained at a meeting that Harvard Maintenance was assigning cleaners to clean microwaves and refrigerators, which she said violated the collective bargaining agreement. That evening, she called supervisor Juliana Perdoda to ask for another supervisor's name in order to complain to the Union and to the NLRB. On that phone call, Perdoda allegedly told Cruz that she could file a complaint but warned that Cruz could end up suspended or with a warning if she did so.

The parties dispute what happened at a March 18, 2020, meeting, which was one of many that Cruz had recorded during her time at the company. The ALJ found that Cruz had complained about the quality of the gloves. Cruz testified that she argued only about the lengths of employees' shifts. Eventually, she left when she was told to go home.

On March 19, Cruz went back to work. She spoke with Murat Mela, VP of operations, who asked her not to return until after the coronavirus if she kept insisting on expressing her opinions. She agreed to go back to work, and as her shift was starting, she spoke with Iljka Feratovic about the latter's workplace concerns. Blerina Alajbegu, a manager, told her to stop "interfering" or to "go home," stating that she "thought Noah [transcription error for Mela] was clear with you."

After a brief back-and-forth, Alajbegu told Cruz to go home. Her suspension was converted to a termination that June.

## II.

Section 7 of the NLRA guarantees employees' "right to self-organization, to form, join, or assist labor organizations, and to bargain collectively, as well as engage in other concerted activities for the purpose of . . . mutual aid or protection." *See Renew Home Health v. NLRB*, 95 F.4th 231, 242 (5th Cir. 2024) (citation modified). Concerted activities include those "of employees who have joined together in order to achieve common goals." *Mobil Expl. & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 238 (5th Cir. 1999).

Section 8(a)(1), in turn, "makes it an unfair labor practice for an employer to 'interfere with, restrain, or coerce employees in the exercise of their Section 7 rights.'" *Apple Inc. v. NLRB*, 143 F.4th 291, 296 (5th Cir. 2025) (quoting 29 U.S.C. § 158(a)(1)) (citation modified). We ask "whether the employer's questions, threats or statements tend to be coercive, not whether the employees are in fact coerced" or what the employer's motivation was. *Renew*, 95 F.4th at 242.

The NLRB's "factual findings are 'conclusive' if they are 'supported by substantial evidence on the record as a whole.'" *Apple*, 143 F.4th at 297. We uphold those findings "only if they are supported by evidence that is substantial when viewed in light of the record as a whole, including 'whatever in

the record fairly detracts from its weight.'" *Id.* We ask whether "a reasonable person could have found what the ALJ found, even if this court may have reached a different conclusion." *Renew*, 95 F.4th at 239. The ALJ's "credibility determinations are binding . . . unless": "(1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Id.* We review challenges to the Board's legal conclusions *de novo* and its procedural and evidentiary determinations for abuse of discretion. *Id.*

### A.

The ALJ found that the Company violated section 8(a)(1) when supervisor Juliana Perdoda "threatened Cruz [over the phone] with suspension, warnings and/or unspecified reprisal for engaging in union activities or filing charges with the Board." According to Cruz, she told Perdoda that she would "file a claim with the union and the NLRB," and Perdoda responded, "[Y]ou're free to do it but I just want to warn you to be careful, you might end up being suspended or getting warning." Perdoda denied so warning Cruz.

The dispute hinges on the NLRB's credibility determinations. The ALJ found that Cruz was more credible than the company's witnesses and based his ruling partially on the demeanor of the witnesses. The company does not contest that Cruz's claim with the union and the NLRB would have been protected activity. It also does not dispute that the statements the Board found Perdoda made are unlawful.

The company asserts that the ALJ was unreasonable to credit Cruz's testimony because it was inconsistent. For instance, Cruz once called a March 18 "gathering" a "meeting" but another time said it was not a meeting. The company also notes that Cruz's testimony changed about whether

4

she played her audio recordings for other people. It complains that she flip-flopped when asked if she had recorded the January 4 phone call. The company also says that the ALJ should have drawn an adverse inference against the General Counsel because he failed to call Eva Barcicki—who was with Cruz during the disputed call—as a witness.

As stated above, we are bound to defer to the ALJ's credibility determinations unless a high bar is met. Likewise, the substantial-evidence standard is easy for Board to satisfy.[1] The inconsistencies were either immaterial or were not so unreasonable as to undo the deference owed to the ALJ. In other words, the ALJ was reasonable to credit Cruz's testimony.

As to whether she had recorded the January 4 phone call, Cruz had recorded over 90 conversations, her being uncertain about whether she recorded a single call is reasonable, and only a painfully literal reading of the ALJ's opinion contradicts the ALJ's finding that Cruz was a "mostly credible witness" who had "no trouble recalling facts."[2] In addition, recordings of relevant meetings were inconsistent with Perdoda's testimony; on that basis alone, the ALJ had sufficient justification for discrediting Perdoda's testimony and crediting Cruz's. Lastly, though the "failure to call [an] available witness[] likely to have knowledge" may trigger an adverse inference, there is no reason to think that Barcicki would have heard what Perdoda said on the other end.[3]

---

[1] *See Universal Camera Corp. v. NLRB*, 340 U.S. 456, 474 (1951) (stating that a court cannot "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.").

[2] *Cf. Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (warning against parsing court opinions like statutes by excising them from their context).

[3] *See NLRB v. E-Sys., Inc.*, 103 F.3d 435, 439 (5th Cir. 1997).

Because the ALJ's credibility determination was reasonable, and the Board's decision was supported by substantial evidence, we deny Harvard Maintenance's request for relief as to the January 3 statements.

## B.

Regarding the alleged violations that occurred on March 19, Cruz testified that she was talking to Iljka Feratovic about the latter's workplace concerns. Cruz told Feratovic "to do the job" and that Cruz would talk to the union delegate later, which was corroborated by an audio recording. Alajbegu told her to stop "interfering." Alajbegu rejected Cruz's explanation that Feratovic had started the conversation. Cruz asserted "the right to talk about working conditions with the co-workers," but Alajbegu told her "to go back to work or . . . go home." After Cruz refused, Alajbegu sent her home. Alajbegu testified that she told Cruz not to "interfere" with Feratovic when Cruz was "inciting fear into [Feratovic] and putting words in her mouth," causing Feratovic to stop working.

The ALJ found that Alajbegu unlawfully threatened Cruz on March 19 by telling Cruz to stop "interfering" as she was speaking with Feratovic. The ALJ stated, "Applying the same analysis as above, I find Alajbegu's words to have been a clear and overt threat that not only had a reasonable tendency to be coercive but were specifically designed to coerce Cruz to stop engaging in protected concerted activity."

The record has enough evidence to support the ALJ's finding of a coercive statement. We ask whether Cruz "could reasonably conclude that the employer is threatening economic reprisals if the employee supports protected conduct." *See Renew*, 95 F.4th at 243 (citation modified). The answer to that question is yes. Immediately before, Mela Murat (VP of Operations) had told Cruz not to "come back until the Coronavirus is done" if she insisted on exercising the "right to express my opinions" about the work-

6

No. 24-60523

place.  When Alajbegu caught Cruz talking with Feratovic, Alajbegu told Cruz, "Um, I thought Noah [transcription error for Mela] actually was clear with you . . . If you're going to continue interfering, I'm gonna need you to go home."  In context, Cruz could reasonably conclude that "interfering" was code for her opinions or protected activity and that she would be suspended if she continued.

The company contends that Alajbegu's statements couldn't have been a threat because, at the time, she hadn't known that Cruz and Feratovic had been discussing workplace conditions.  Even if that were true, an employer's subjective motivation is irrelevant.[4]

Because the Board's decision was supported by substantial evidence, we deny Harvard Maintenance's request for relief as to the March 19 coercive statements.

III.

Next, we address the NLRB's determination that Harvard Maintenance suspended Cruz on March 18, and suspended, then discharged, her on March 19, because of her protected conduct.  Her final termination was that June. We deny the company's request for relief.

"[A]n employer's termination of an employee violates Section 8(a)(1) if the employee's protected conduct was a motivating factor in the decision to discharge the employee.  The employee's protected activity must be at least 'a substantial or motivating factor,' but need not be 'the sole motivating factor.'" *Renew*, 95 F.4th at 245 (citation modified).

---

[4] *See Renew*, 95 F.4th at 242 ("The analysis is framed from the perspective of the employee and is not contingent on 'either the motivation behind the remark or its actual effect.'") (quoting *Miller Elec. Pump & Plumbing*, 334 NLRB 824, 824 (2001)).

The parties agree that we apply the *Wright Line* framework. *See id.* at 244. Under that framework, "the General Counsel must show, by a preponderance of the evidence, that [1] the employee was engaging in protected activity, [2] the employer had knowledge of the activity, [3] adverse action was taken against the employee, and [4] the activity was a motivating factor in the decision to discharge the employee." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 320–21 (5th Cir. 2013). The company may then prove an affirmative defense that it would have fired the employee regardless of the protected activity. *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 423–24 (5th Cir. 2021).

## A. Protected Activity

Again, concerted activity "embraces the activities of employees who have joined together in order to achieve common goals." *Mobil*, 200 F.3d at 238. As discussed below, the ALJ reasonably found that Cruz was engaged in protected activity when she spoke up at the March 18 pre-shift meeting, complaining about the rubber gloves, and on March 19 when she was speaking with Feratovic. It also noted "multiple grievances and unfair labor practice[]" reports that constituted protected activity, activity that the company doesn't dispute.

### 1. March 18 Meeting

The company denies that Cruz's conduct on March 18 was protected because Cruz disrupted the safety meeting and "disparaged (using profanity) the gloves [the company] provided." The Board's opposite conclusion was reasonable.

At a brief meeting on March 18, Cruz argued with manager Perdoda about shift lengths, sometimes interrupting her.[5] Eventually, Cruz said, "I

---

[5] Although the ALJ found, and Perdoda testified, that Cruz's complaints were about gloves, that is unsupported by the recording's transcript or by Cruz's testimony.

will report you," to which Perdoda responded, "You have the right to report me." After that, Cruz retorted, "I will," and Perdoda then instructed, "Right now change and go home. I've had it—enough. Change and go home right now."

The ALJ reasonably found that the incident was protected activity. She raised collective concerns about employees' shift lengths and stated that she would "report" Perdoda, stating "If *we* not working the eight hours . . . Why should *we* be working—the complete four hours?" Those complaints "had some relation to group action in the interests of the employees." *Mobil*, 200 F.3d at 239.

Nor did Cruz's March 18 conduct lose protection as "abusive" or "flagrantly insubordinate." *See id.* at 238. Though she may have been rude, there is no evidence that she was "insulting, provocative or violent." *Id.* at 241–43 (stating that employees have "some leeway for impulsive behavior"). It is also important that the recording showed no profanity, contrary to Harvard Maintenance's claims.

### 2. March 19 meeting

Again, on March 19, Cruz and Feratovic were discussing the latter's workplace concerns. Cruz told her to "do the job" and that Cruz would talk to the union delegate later. Alajbegu instructed Cruz to stop "interfering" or to "go home." Cruz asserted the right "to talk about working conditions" and said that she would "report this." Alajbegu then told Cruz to "go home."

The ALJ reasonably determined that Cruz's March 19 conduct—with

---

More importantly, the transcript contains no profanity of which the company and Perdoda complained.

9

references to "reporting" and "working conditions"—had "some relation to group action in the interest of the employees" and thus constituted protected activity. *See id.* at 239. To the extent the company's witnesses testified differently, we defer to the ALJ's resolution of such conflicts.[6]

## B. Knowledge of Protected Activity and Adverse Action

Next, the Board must show that the employer knew about Cruz's protected activity. *Arkema*, 710 F.3d at 320–21. Harvard Maintenance does not dispute knowledge—only whether the conduct was protected. Nor can there be any dispute that she experienced adverse action when she was ultimately terminated.

## C. Motivated by Animus

Next, the "protected activity must be at least 'a substantial or motivating factor,' but need not be 'the sole motivating factor,'" for the adverse employment action. *Renew*, 95 F.4th at 245. We consider (1) "the timing of the employer's action in relationship to union activity," (2) "the presence of other unfair labor practices," (3) the failure to investigate the conduct alleged as the basis for the discipline," (4) "discipline that deviates from the employer's past disciplinary practice," (5) "implausibility of the employer's explanation," (6) "inconsistencies between the employer's proffered reason . . . and other actions of that employer," and (7) "the seriousness of the alleged violation." *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 465 (5th Cir. 2001).

The ALJ reasonably determined that the company was motivated by

---

[6] *See NLRB v. Brookwood Furniture*, 701 F.2d 452, 456 (5th Cir. 1983) ("[W]here, as here, the record is fraught with conflicting testimony, requiring essential credibility determinations to be made, the trier of fact's conclusions must be accorded particular deference.").

protected activity in firing Cruz. *See Renew*, 95 F.4th at 245 (deferring to the NLRB's intent finding). Managers had threatened Cruz with a suspension or warning during previous times when she had engaged in protected activity, so the ALJ was reasonable to find that they were motivated by that activity when they finally fired her. It cited also the "timing of [the company's] decision," which was "within 24 hours of the [March 18 and 19 protected] conduct here."[7]

The ALJ also reasonably found that the company had imposed less punishment for "similar or more severe misconduct." *Valmont*, 244 F.3d at 465. The Board cites several examples of employees who were warned and not immediately discharged:

- An employee was warned and suspended for three days for being late and, when confronted, "yelling" at her supervisor over the phone.
- One was warned for poor work performance and for yelling at his supervisor when confronted.
- One was warned and suspended for sexual harassment.
- When verbally warned for tardiness, an employee "started raising his voice" at his supervisor; he was suspended for insubordination and told to go home.

The ALJ asserted, and the company does not dispute, that Cruz had no history of misconduct in the 18 years she worked there, in contrast to these employees. But while employees with worse behavior were suspended, Cruz was terminated. The ALJ also noted, and the company doesn't dispute, that the company didn't conduct much of an investigation before terminating Cruz.[8]

---

[7] *See Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 426 (5th Cir. 2021) (considering timing of discharge).

[8] *See NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 n.5 (5th Cir. 1984) (finding

No. 24-60523

The company asserts that it fired Cruz because of "[h]er disruptions, interference, and refusal to follow reasonable management instructions." That "loud and disruptive behavior" was sometimes in the presence of clients. The company stresses that, in each of three recorded conversations on the record, supervisors "positively and consistently communicated their recognition that Cruz had the right to address her concerns by filing grievances, ULP charges, and otherwise." But the ALJ reasonably rejected that explanation, especially in light of "audio recordings" that contradicted it. *Brookwood*, 701 F.2d at 456.

The ALJ's determination was thus reasonable that the company was motivated by Cruz's protected activity, and we defer to that decision.[9]

### D. Affirmative Defense

Harvard Maintenance has an affirmative defense if it can prove that it would have fired Cruz regardless of the protected conduct. *Cordua*, 985 F.3d at 423–24. The NLRB cited several reasons for rejecting the company's affirmative defense. Its conclusion was reasonable, and we defer to it.

To prove that it would have fired Cruz regardless of any protest and on account of her insubordination and disruption, the company points to three examples of employees it fired:

- Tineo was fired after yelling, "using profanity and being abusive" with a supervisor and foreman, and telling them "in a threatening manner, that [he was] going to record our conversation," after the supervisor told him to take out the trash. Tineo was repeatedly warned for multiple prior violations of policy.

---

that a "one-sided investigation" is indicative of discriminatory animus).

[9] *See Brookwood*, 701 F.2d at 456 ("[W]here, as here, the record is fraught with conflicting testimony, requiring essential credibility determinations to be made, the trier of fact's conclusions must be accorded particular deference.").

No. 24-60523

- When a foreman complained that Santana was refusing to follow instructions, a supervisor tried to convince Santana to work; he "totally ignore[d]" the supervisor and refused to take the keys necessary for that day's work. The company fired him.
- When handed a holiday bonus check by a client, Acevedo "became loud and obnoxious" and "flung the check." He was terminated five days later.

The ALJ reasonably found that the company wouldn't have fired or suspended Cruz had she not engaged in protected conduct. *See Valmont*, 244 F.3d at 465 (considering disparate discipline). Even if Cruz had talked back to her supervisor, her misconduct was not like Santana's, who refused to do his work or to take the keys necessary for the work. Although the company asserts that Cruz used profanity or caused a panic, the Board reasonably rejected that testimony, as discussed previously.

As a consequence of the previous analysis, Harvard Maintenance's petition for review is denied in regard to the findings of coercive statements and the discharge.

IV.

Harvard Maintenance challenges the NLRB's remedy of direct and foreseeable pecuniary damages, which it says exceeds the NLRB's statutory authority and violates the Seventh Amendment.[10] The NLRB first prescribed that remedy in *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022), *vacated in part on other grounds by Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024).

---

[10] Because we ultimately determine that the NLRB did not have statutory authority to prescribe the *Thryv* remedy, we need not reach the question whether the order of pecuniary damages violated the Seventh Amendment.

13

No. 24-60523

### A. Jurisdiction and Exhaustion

First, the NLRB contends that the court doesn't have jurisdiction to consider the argument regarding *Thryv* remedies because Harvard Maintenance did not raise it before the NLRB. The company avers that it wasn't required to exhaust because exhaustion would have been futile.

Absent "extraordinary circumstances" excusing "the failure or neglect" to raise an argument, "[n]o objection that has not been urged before the Board . . . shall be considered by the court." 29 U.S.C. § 160(e). That rule applies also to constitutional arguments.[11] One "extraordinary circumstance[]" excusing the exhaustion requirement is futility.[12] This court excused the exhaustion requirement where, *inter alia*, the Board had "discussed" the unexhausted issue of due process.[13]

The futility exception likewise applies here. The Board considered, and rejected, dissenting board member Kaplan's position that the make-whole remedy was unlawful. And "[a]ny attempt by [the company here] to add to the debate . . . would have been futile." *Id.* In addition, the Board insists that its remedy from *Thryv* "remains valid precedent."[14] Therefore, failure to exhaust does not preclude the company's challenge here.

---

[11] *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 (5th Cir. 2013).

[12] *See id.* at 551 (acknowledging a "futility exception where it would be an empty formality to require filing a motion to reconsider before the Board"); *NLRB v. Robin Am. Corp.*, 667 F.2d 1170, 1171 (Former 5th Cir. Unit B 1982) (finding exhaustion "futile, if not frivolous" partly because Board's order was "in accord with Fifth Circuit precedent" at the time.).

[13] *See Indep. Elec. Contractors, Inc. v. NLRB*, 720 F.3d 543, 552 (5th Cir. 2013) (finding the NLRB had "preemptively denied that it had denied due process," so "[a]ny attempt by the [company] to add to the debate . . . would have been futile.").

[14] *Thryv*, 2022 WL 17974951, at *9; *see Robin*, 667 F.2d at 1171 (futility where Board's order "was fully in accord with Fifth Circuit precedent").

No. 24-60523

## B. Statutory Authority

Section 10(c) allows the NLRB to order an employer "to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." 29 U.S.C. § 160(c). Harvard Maintenance asserts that that provision allows the NLRB to order only equitable remedies, not legal remedies addressed to the "direct or foreseeable pecuniary harms" awarded here.

The NLRB avers that § 160(c) does not limit the Board to equitable relief and permits all remedies that "bear[] appropriate relation to the policies of the Act." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 348 (1953)). But even if the statute permits only equitable remedies, the NLRB contends that the *Thryv* remedy is equitable. As this court recently held in *Hiran Management, Inc. v. NLRB*, 157 F.4th 719 (5th Cir. 2025), the *Thryv* remedy does exceed the NLRB's statutory authority because the Board can give only equitable relief, and the *Thryv* remedy is legal relief.

### 1. Whether the Statute Permits Non-Equitable Remedies

The first issue is whether § 160(c) permits the NLRB to order only relief that is equitable. As the Third Circuit explained in *NLRB v. Starbucks Corp.*[15] and as this court recently explained in *Hiran*, 157 F.4th at 725, the text of § 160(c) allows only equitable remedies. *See Starbucks*, 125 F.4th 78, 95 (3d Cir. 2024). The Board may "order entities 'to cease and desist' and to take 'affirmative action.'"[16] That is a description of the role of courts of

---

[15] Judges Eid and Bumatay also explained this point in dissents. *See 3484, Inc. v. NLRB*, 137 F.4th 1093, 1116 (10th Cir. 2025) (Eid, J., dissenting); *Int'l Union of Operating Eng'rs v. NLRB* ("*Macy's*"), 127 F.4th 58, 88 (9th Cir. 2025) (Bumatay, J., dissenting), *petition for cert. filed* (U.S. Nov. 26, 2025) (No. 25-627).

[16] *Starbucks*, 125 F.4th at 95 (first quoting *Ex parte Lennon*, 166 U.S. 548, 556 (1897); then quoting Samuel L. Bray, *The System of Equitable Remedies*, 63 U.C.L.A. L. REV. 530,

equity, which could "restrain[] . . . contemplated or threatened action" or "require affirmative action, where the circumstances of the case demand it." *Lennon*, 166 U.S. at 556.

The statute's "affirmative action" examples also show that it allows only equitable relief. It includes reinstatement with backpay, which is equitable because it "is based on what an employer has wrongfully withheld from an employee, . . . 'a form of restitution.'" *Starbucks*, 125 F.4th at 96 (quoting *Curtis v. Loether*, 415 U.S. 189, 197 (1974)).[17]

The Act's design also demonstrates that its remedy is limited to equitable relief. Its purposes are "to prevent . . . the costly dislocation and interruption of the flow of commerce caused by unnecessary industrial strife and unrest." *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539, 540 (1943). It was not "a general scheme authorizing the Board to award full compensatory damages."[18] A scheme "to award full compensatory damages," *Russell*, 356 U.S. at 642–43, or other legal relief would thus violate the Act's purpose, *Va. Elec.*, 319 U.S. at 539, 540. "[I]t is not enough . . . to say that they would have the effect of" encouraging fair labor practices; otherwise, the NLRB "would be free to set up any system of penalties" it wanted.[19]

The Board also points to *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177,

---

553 (2016) (describing equitable remedies as a "way for courts to compel action or inaction")).

[17] *See also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900–01 (1984) (describing "backpay" under § 160(c) as "equitable"); *Johnson v. Ga. Highway Exp., Inc.*, 417 F.2d 1122, 1125 (5th Cir. 1969) (stating that Title VII backpay is not damages but instead is an "integral part of the statutory equitable remedy").

[18] *Int'l Union, United Auto., Aircraft & Agric. Implement Workers of Am. (UAW-CIO) v. Russell*, 356 U.S. 634, 642–43 (1958); *accord Starbucks*, 125 F.4th at 95–96.

[19] *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11 (1940) (holding that the statute doesn't convey "virtually unlimited discretion to devise punitive measures").

No. 24-60523

188 & n.6 (1941), under which, it says, the Court implicitly rejected an equitable-relief limitation. But that case was about whether the NLRB could order an unenumerated form of equitable relief—the hiring of a wrongfully rejected candidate, as distinguished from the reinstatement of a wrongfully fired employee—not about whether the NLRB could order legal relief. *Id.* at 188; *see 3484, Inc.*, 137 F.4th at 1126 (Eid, J., dissenting).

ii. Whether the *Thryv* Remedy Is Legal or Equitable

The NLRB ordered Harvard Maintenance to "[m]ake Carina Cruz whole for . . . any other direct or foreseeable pecuniary harms, suffered as a result of the discrimination against her." The Board asserts that its *Thryv* remedy is equitable.[20] That remedy "is not designed to 'punish bad actors,'" it says, which would make the remedy legal, but "to undo the coercive effects of unfair labor practices so that employees are willing to exercise their statutory rights again in the future." Harvard Maintenance, on the other hand, contends that the remedy constitutes legal compensatory damages.

As previously stated, *Hiran* forecloses the NLRB's theory that the make-whole remedy is equitable. *Hiran*, 157 F.4th at 728. For the sake of completeness, however, we address the Board's arguments in full because some are unique to this case.

The NLRB avers that its relief is equitable but "[m]oney damages are . . . the classic form of *legal* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993).[21] Damages are "[m]oney claimed by, or ordered to be paid to, a

_____

[20] "[T]he *Thryv* remedy is in any event also properly characterized as equitable"; "*Starbucks* failed to explain why the *Thryv* remedy . . . is not properly deemed equitable as an aspect of the Board's order to restore the status quo." Brief of Respondent-Appellee at 49.

[21] *See also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710–

person as compensation for loss or injury." *Damages*, BLACK'S LAW DICTIONARY (12th ed. 2024).[22] Consequential damages are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." *Consequential damages*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see 3484, Inc.*, 137 F.4th at 1126 (Eid, J., dissenting).

Equitable awards, by contrast, are remedies such as injunctions, restitution, and mandamus. *See Mertens*, 408 U.S. at 255, 256. They exclude "compensatory or punitive damages" "or other consequential damages (*e.g.*, a ruined credit rating)." *Id.* at 255; *United States v. Burke*, 504 U.S. 229, 238, 239 (1992). They are measured by "what . . . the taker [has unrighteously] gained." *Monterey*, 526 U.S. at 710; *Chauffeurs*, 494 U.S. at 570–71 (noting that restitution and disgorgement are equitable).

The NLRB's remedy here constitutes consequential damages. *See Hiran*, 125 F.4th at 728; *see also Starbucks*, 125 F.4th at 96–97. Its order—compensation for "direct or foreseeable pecuniary harms" flowing from unlawful "discrimination," is the same as definitions of damages and consequential damages.[23]

---

11 (1999) (stating that compensation is legal); *Feltner v. Colum. Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) (same).

[22] *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered" because of "defendant's wrongful conduct."); *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570–71 (1990) (stating that damages includes benefits that victims "would have received" had defendant "properly" performed duty).

[23] *Damages*, BLACK'S LAW DICTIONARY, *supra* ("compensation for loss or injury"); *consequential damages*, BLACK'S LAW DICTIONARY, *supra* (losses "result[ing] indirectly from the [injurious] act"). The Ninth Circuit disagreed, holding that any compensation was "merely incidental to 'the effectuation of the policies of the Act' because the remedy is primarily 'designed to . . . eliminat[e] . . . industrial conflict,' vindicating 'public, not private rights.'" *Macy's*, 127 F.4th at 83. *But see id.* at 90–91 (Bumatay, J.,

No. 24-60523

The NLRB's examples of its new remedy also confirm that it is legal damages, not equitable relief. The Board believes it is permitted to award money damages for "interest and late fees on credit cards," "penalties if she must make early withdrawals from her retirement account," the loss of "her car or her home[] if she is unable to make loan or mortgage payments," "increased transportation or childcare costs," "medical expenses, [and] credit card debt." *Thryv*, 2022 WL 17974951, at *15. "That list looks like something out of a torts treatise. Each of those examples is a quintessential basis for compensatory or consequential damages."[24]

The NLRB all but admits that its remedy is compensatory.[25] Indeed, before creating the new remedy, the NLRB asked parties "whether [it] should . . . in all pending and future cases [award] consequential damages[.]" *Id.* at *9 n.8. It conveniently claims now that this remedy isn't consequential damages.

The Board cannot escape that classification by asserting that its remedy has an "equitable purpose" of "undo[ing] . . . coercive effects of unfair labor practices." Whether a remedy is permissible doesn't depend on magic words that the NLRB incants.[26] We ask whether the "remedy [is] tradi-

_____

dissenting).

[24] *3484, Inc.*, 137 F.4th at 1125 (Eid, J., dissenting) (noting that damages include "medical expenses and lost earnings," "transportation and travel expenses, costs of domestic help" (citing, *e.g.*, RESTATEMENT (THIRD) TORTS §§ 4, 19).

[25] *Compare* Brief of Respondent-Appellee at 50 ("*Thryv* relief . . . effectuates the Act's policies by restoring the status quo"), and *Thryv*, 2022 WL 17974951, at *14 (designed to "compensat[e]"), *with* RESTATEMENT (SECOND) TORTS § 903, cmt. A ("compensatory damages . . . place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed").

[26] *See 3484, Inc.*, 137 F.4th at 1125, 1126 (Eid, J., dissenting in part) (characterization "little more than window dressing" that "does not change the tort-like legal nature of the remedy"); *Macy's*, 127 F.4th at 91 (Bumatay, J., dissenting) (clever wording "doesn't

tionally viewed as 'equitable,' such as injunction or restitution." *Mertens*, 508 U.S. at 255. We also examine the "the considerations that determine the availability" and size of the remedy. *See SEC v. Jarkesy*, 603 U.S. 109, 123–25 (2024). The criteria all depend on compensating the employee for injury, which shows that the remedy is legal.[27]

Furthermore, the Board overreads *Jarkesy*. Under its interpretation, "restoring the status quo" has a capacious scope. The NLRB states that the consequential damages remedy is consistent with longstanding Supreme Court precedent because it is not designed to punish bad actors but instead to implement the statutory principles of rectifying the harms actually incurred by the unfair labor practices and restoring the victims to where they would have been but for the unlawful conduct. Under the proposed standard, there would be no reason for compensatory damages, the aforementioned classic example of legal relief, ever to be considered anything but equitable relief.[28]

That misuse of *Jarkesy* stems from a fundamental misunderstanding of the scope of the Supreme Court's opinion. In *Jarkesy*, the Court stated that the determination between whether a monetary remedy is legal is "if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Jarkesy*, 603 U.S. at 123. The Board would have

---

change [the remedy's] legal nature—it's still consequential damages"); *Republic Steel*, 311 U.S. at 11; *Mertens*, 508 U.S. at 255 (rejecting party's "equitable" classification of "monetary relief for all losses . . . a result of the alleged breach.").

[27] *See Hiran*, 125 F.4th at 728 ("Because the Board's remedy aims to redress concrete losses to the Employees wholly apart from backpay and pay-related costs, it covers harms typically dealt with in tort suits for compensatory damages, and it operates as a compensatory damages order.").

[28] *See id.* ("If the Board were correct, then all instances of compensatory damages could qualify as an equitable remedy.").

No. 24-60523

us understand restoring the *status quo* to include compensatory and consequential damages, but the Court required not just that the policy be designed to restore the *status quo*, but that it be designed "*solely* to 'restore the status quo.'" *Id.*

Those instances in which the court has found that a remedy maintains the *status quo* involve remedies such as restitution or disgorgement, or in other words removing improper gains from the unjustly enriched party and returning it to a rightful source.[29] The Court's precedents demonstrate that the scope of restoration to the *status quo* is primarily concerned with the return of money unjustly taken, not making the defendant whole.

That contrast is also driven home by the examples that the Court provides in *Jarkesy* as to the scope of legal and equitable relief.[30] It would be an erroneous extension of precedent to capture a consequential-damages award under the banner of equity based on the Board's acontextual reading of *Jarkesy*, as consequential damages do not restore the *status quo*.

Lastly, contrary to the NLRB's assertion, its remedy is not equitable as "incidental or intertwined with injunctive relief."[31] The potential damages are limited only by "the Board's imagination."[32]

---

[29] *See Liu v. SEC*, 591 U.S. 71, 80 (2020) ("Decisions from this Court confirm that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts."); *see also Tull v. United States*, 481 U.S. 412, 424 (1987) ("Restitution is limited to 'restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant.'").

[30] *See Jarkesy*, 603 U.S. at 123 ("[W]hile courts of equity could order a defendant to return unjustly obtained funds, only courts of law issued monetary penalties to 'punish culpable individuals.'").

[31] *Chauffeurs*, 494 U.S. at 571; *Tull v. United States*, 481 U.S. 412, 424–25 (1987) (finding a $22 million penalty not "incidental" where "modest equitable relief.").

[32] *Macy's*, 127 F.4th at 90–91 (Bumatay, J., dissenting) (observing that the NLRB

21

Accordingly, the NLRB exceeded its authority by awarding these consequential damages, and we grant Harvard Maintenance's request for relief from the damages directive, vacating the portion of the order that awards "direct and foreseeable pecuniary harms, suffered as a result of the discrimination against [Cruz]."

## V.

Lastly, Harvard Maintenance filed a Federal Rules of Appellate Procedure Rule 28(j) letter highlighting *Space Exploration Technologies Corp. v. NLRB*, 151 F.4th 761 (5th Cir. 2025). Harvard Maintenance renewed an argument made in a footnote of its opening brief, claiming that it should prevail because the Board and ALJs exercise core executive functions and are unconstitutionally insulated from removal. Because the company failed to explain, anywhere in its briefing, how the unconstitutional insulation of either party caused compensable harm, there are no grounds on which it can be granted relief.

In *Collins v. Yellen*, 594 U.S. 220, 257 (2021), the Court rejected an argument that the mere fact that an officer exercising executive authority was unconstitutionally isolated rendered that officer's acts void and without effect.[33] The Court did, however, still recognize that a claim for retrospective relief can proceed if there was "compensable harm" inflicted. *Id.* at 259. As previously stated, Harvard Maintenance provides no arguments as to compensable harm and thus has failed to demonstrate that there is sufficient

---

has claimed authority to award, *e.g.*, "expenses resulting from a change in immigration status").

[33] "Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken . . . as void."

No. 24-60523

injury to justify relief.

\* \* \* \* \*

In sum, Harvard Maintenance's petition for review is GRANTED as to the award of consequential damages and DENIED in respect to the NLRB's findings of coercive statements and unlawful discharge. The Board's cross-application for enforcement regarding the coercive statements and discharge is GRANTED. Its cross-application is DENIED insofar as the order awards consequential damages.

No. 24-60523

Jᴀᴍᴇs L. Dᴇɴɴɪs, *Circuit Judge*, concurring in part and dissenting in part:

We lack jurisdiction to consider the employer's challenge to the *Thryv*[1] remedy. All agree that the employer never raised a challenge to the remedy before the Board. Section 10(e) of the National Labor Relations Act therefore strips us of jurisdiction to consider this belated challenge.[2]

The majority nevertheless invokes the "futility exception," principally on the ground that the Board "considered[] and rejected[] dissenting board member Kaplan's position that the make-whole remedy was unlawful." *Ante*, at 14. Nothing in the record supports that assertion.

The majority's futility analysis is otherwise notably lacking. It essentially asserts, in the alternative, that arguing before the Board would have been futile because, well, it would have been futile. That kind of "because I say so" reasoning will not suffice. Our precedent applies the futility exception sparingly. *Compare NLRB v. Robin Am. Corp.*, 667 F.2d 1170, 1171 (5th Cir. 1982) (futility satisfied when a controlling doctrine was only recently overruled), *with D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013) (no extraordinary circumstances where legal arguments

---

[1] 372 NLRB No. 22, slip op. at 1 (Dec. 13, 2022), *order vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024).

[2] *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) ("[T]he Court of Appeals was without jurisdiction to consider that question. The issue was not raised during the proceedings before the Board . . . . Thus, judicial review is barred by § 10(e) of the Act."); *see also Pub. Serv. Co. of N.M. v. NLRB*, 692 F.3d 1068, 1076–77 (10th Cir. 2012) (Gᴏʀsᴜᴄʜ, J.) ("[W]e are confident that § 160(e) is a jurisdictional limit on this court's authority, just as . . . *Woelke* said it was."); *Quickway Transp., Inc. v. NLRB*, 117 F.4th 789, 818 (6th Cir. 2024), *cert. denied*, 145 S.Ct. 1427 (2025) (Mem.) ("We join our sister circuits in determining that § 10(e) creates a jurisdictional rule. Ruling otherwise would create a circuit split where none currently exists." (citations omitted)).

"were available . . . from the outset"). The majority offers no reasoned basis for invoking the exception here.

On the merits, principles of judicial restraint independently counsel against the majority's extended discussion of the *Thryv* remedy. The issue is no longer *res nova* in this circuit. *See Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 722 (5th Cir. 2025) (deepening a circuit split). I disagree with *Hiran*'s conclusion, but we are bound by it under our rule of orderliness. That binding precedent alone disposes of the issue. The majority's lengthy treatment adds nothing necessary to the judgment.

I respectfully concur in part and dissent in part.