# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 7, 2024

Lyle W. Cayce
Clerk

———————

No. 22-60584

———————

Renew Home Health, *a Division of Maxus Health Care Partners, L.L.C.*,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

———————————————————

Appeal from the National Labor Relations Board
Agency No. 16-CA-260038

———————————————————

Before Jones, Stewart, and Duncan, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Renew Home Health ("Renew") petitions for review of a National Labor Relations Board ("Board") Decision and Order determining that (1) its RN Case Managers are not supervisors exempt from the National Labor Relations Act (the "Act") and that (2) Renew violated § 8(a)(1) of the Act by: creating an impermissible oral workplace rule, threatening its employees for exercising protected activity, interrogating staff about their concerted activities, and unlawfully terminating an RN named Ann Bornschlegl, the

No. 22-60584

charging party. The Board cross-applies for enforcement of its Order. For the following reasons, both Renew's and the Board's petitions are DENIED in part and GRANTED in part.

## I.

Renew provides in-home nursing, therapy, and aide services across the state of Texas. Renew operates multiple branches, including its service branch and headquarters in Fort Worth, Texas. In 2019 and 2020, Branch Manager Cara Thornwald oversaw Renew's Fort Worth facility, and Chief Operating Officer Phillip Criswell and Director of Nursing Johanna Ray also oversaw the branch's operations in addition to operations at Renew's other branches. Like many Renew employees, Criswell, Ray, and Thornwald are experienced medical professionals. Thornwald made hiring, firing, and discipline decisions on behalf of Renew with respect to the Fort Worth branch. Criswell and Ray shared similar authority and duties and could discharge employees from any Renew branch.

## A.

In the Spring of 2020, Renew employed around sixty individuals in its Fort Worth branch. Its staff contained approximately eight Home Health Aides ("HHAs"), thirty Licensed Vocational Nurses ("LVNs"), and a dozen Registered Nurse Case Managers ("RNs"). Bornschlegl served as an RN in Renew's Fort Worth branch from 2010 until her termination in April 2020. According to employee records, Bornschlegl was an exemplary employee as an RN but often expressed sharp criticism of Renew's leadership.

2

One stark example occurred during an August 2019 training session with Renew's quality assurance ("QA") department. Bornschlegl made comments critical of Renew's operations and leadership structure in response to a solicitation for questions. Penny Rivera, the head of the QA department and coordinator of the training session, testified that Bornschlegl's critique "was basically that if they would pay the LVNs more money, they could get rid of the QA department, and then they could use the QA salaries for the payment of the LVNs." Rivera reported Bornschlegl to Criswell and Ray because she perceived that the comment was disruptive. Renew's leadership then met with Bornschlegl and told her that while she had "a right to bring concerns about the fact that the LVNs are doing too many visits . . . you just don't do that kind of thing in" a training setting.

Renew placed Bornschlegl on an individualized discipline plan (the "August 2019 discipline plan") that required her to "bring any grievances she is harboring to her supervisor for resolution and avoid discussing her grievances with her coworkers." The plan warned that failure to comply may result in termination. Bornschlegl's discipline plan was only viewed by Criswell, Ray, and Renew's HR Manager, and Bornschlegl did not share the details of the plan with any other employee.

**B.**

In every branch, Renew holds a weekly case conference to discuss patient status. After the onset of COVID-19, Renew held the weekly meetings via videoconference because it restricted field staff access to its offices. On April 15, 2020, Renew announced that all field staff were required

to treat COVID-19 patients and that they would receive an additional $10 payment for each patient. On April 16, 2020, Thornwald led a call with employees to discuss patient information and the new COVID-19 policies. The discussion around the policies quickly became heated.

On the call, Bornschlegl and other employees inquired about personal protective equipment ("PPE") stock, risk compensation, forming a dedicated team to treat COVID-19 patients, and lost wages due to the field staff restrictions at assisted-living facilities. Several employees on the call were unsatisfied with Renew's policies and Thornwald's responses to their questions. Ultimately, Thornwald disconnected from the call while Bornschlegl was asking her a question on these issues. That same day, Bornschlegl reached out to Thornwald with more questions via instant message. Thornwald informed Bornschlegl that they should "try to work together as a team to encourage each other thru [sic] rather than create a disruption." At the close of their conversation, Thornwald texted Bornschlegl that "I appreciate your ideas/questions, just please bring them individually in order to avoid creating a morale problem."

Thornwald's responses to other concerned employees relayed a more upbeat tone regarding the circumstances. For instance, Thornwald said to another employee that she "totally understand[s] your concerns/fears! But we can not [sic] be getting everyone all worked up in a negative way like happened on that call. We need to work as a team to pull together to get thru [sic] this hard time . . . hang in there and keep providing the good care you do to your patients."

No. 22-60584

## C.

In late April 2020, Bornschlegl began talking with fellow Renew employees about Renew's COVID-19 policies, insufficient hazard pay, and concerns over accessing assisted-living facilities. The employees agreed in a group text to reach out to leadership about these issues. Bornschlegl volunteered to relay the group's concerns in a signed Kmail message[1] to management (the "Kmail"). Bornschlegl's Kmail included the signatures of the dozen employees in the group text and asserted that it was a "group effort" to outline COVID-19 policy related concerns. However, the Kmail erroneously included one employee who did not expressly agree to sign with the cohort, Gina Anderton. When Renew questioned Anderton about her knowledge of the Kmail, Anderton informed Renew that she had not agreed to sign it. In actuality, Anderton's message, which stated that she was not interested in signing the draft, was not delivered to Bornschlegl.

Renew then inquired with individual employees as to the basis of their signature of the group message and to what "threats of disciplinary actions and terminations that were alluded to in the last line of communication." Thornwald reached out to each employee on the signed message via Kmail and asked whether they fully agreed with the terminology and verbiage in Bornschlegl's Kmail.

_____

[1] Kmail is Renew's internal communications system.

No. 22-60584

**D.**

On April 28, 2020, Renew's management again met with Bornschlegl. Criswell, Ray, and Thornwald asked for further clarification regarding the employees' coordination before drafting the Kmail. Bornschlegl stated that they had formed a group text to discuss the policies. Bornschlegl asked if discussing workplace grievances with her coworkers was prohibited and Ray responded that Bornschlegl's August 2019 discipline plan provides "that if [she had] any grievances, that we would need for you to come to us and take those up with us."

Criswell then began discussing each of the points raised in the group Kmail. He then raised the issue that Bornschlegl did not have Anderton's permission to sign her name, and Bornschlegl contended that she did not realize that Anderton objected to her inclusion in the message. Renew's leadership theorized that the mix-up may be sufficient grounds to constitute discipline under Renew's falsification policy for signing Anderton's name without her consent.[2] Ray informed Bornschlegl that her actions violated her August 2019 discipline plan. Ray then read the plan's requirements section, which mandated that Bornschlegl not discuss grievances with her coworkers. Criswell then discharged Bornschlegl for violating Renew's falsification policy and the August 2019 discipline plan.

---

[2] Prior records indicate that employees previously punished or discharged under the falsification policy were penalized for falsifying client records or official business records. Examples included recording visits or procedures on patients that did not occur.

Bornschlegl then filed a charge with the Board and, after investigation, the Board's General Counsel filed a complaint against Renew. The complaint alleged that Renew violated § 8(a)(1) on several counts for the conduct described above. Following a four-day hearing, an administrative law judge ("ALJ") determined that Renew violated § 8(a)(1) as alleged by the Board's general counsel. Renew filed its objections to the ALJ's determinations and the Board subsequently affirmed the ALJ's order. Renew then filed the instant petition with this court. The Board cross-appealed for enforcement of its Order.

## II.

We will affirm the Board's findings of fact if they are supported by substantial evidence in the record considered as a whole. *UNF W., Inc. v. NLRB*, 844 F.3d 451, 456 (5th Cir. 2016). We have defined substantial evidence as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012). While the reviewing court must consider evidence that detracts from the Board's findings, the ALJ's decision will stand "if a reasonable person could have found what the ALJ found," even if this court may have reached a different conclusion had the matter been presented to it in the first instance. *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988). The ALJ's credibility determinations are binding on this court "unless one of the following factors exists: (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is

based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). We review challenges to the Board's legal conclusions de novo and its procedural and evidentiary determinations for abuse of discretion. *Id.*; *Marathon LeTourneau Co. v. NLRB*, 699 F.2d 248, 254 (5th Cir. 1983). Likewise, we review the Board's conclusions of supervisory status for support by substantial evidence in the record as a whole. *See Poly-America, Inc. v. NLRB*, 260 F.3d 465, 479–80 (5th Cir. 2001).

## III.

Renew challenges the Board's determinations that Renew's RNs are not supervisors under § 2(11) of the Act and that it violated § 8(a)(1) on four counts for its conduct in the Spring of 2020. As a threshold question, we first address the issue of whether Renew's RNs have supervisory authority.[3]

### A. Statutory Supervisor

Section 2(11) of the Act defines a "supervisor" as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

---

[3] Persons who are supervisors are not protected by the Act. 29 U.S.C. § 152(3); *NLRB v. Ky. River Cmty. Care*, 532 U.S. 706, 711 (2001) ("Supervisors would fall within the class of employees [protected under the Act], were they not expressly excepted from it.").

29 U.S.C. § 152(11). The Supreme Court has interpreted § 2(11) to establish a three-part test:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

*Ky. River Cmty. Care*, 532 U.S. at 713. "Whether an employee is a supervisor is a question of fact." *STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507, 513 (5th Cir. 2020). The party asserting supervisory status carries the burden of proof. *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 295 (5th Cir. 2015).

On appeal, Renew argues that the Board ignored substantial evidence in the record that demonstrated that its RNs are supervisors under the Act. Renew asserts that its RNs have the authority to assign work, discipline employees, recommend hires, and address grievances of LVNs and HHAs. It points out that Criswell testified to the RNs' authority at the administrative hearing before the ALJ. Renew further contends that secondary indicia of authority, including the job description, organizational structure, and provisions of the Texas state regulations governing RNs suggest that they are supervisors.

Here, we conclude that Renew has failed to satisfy its burden. Its RNs serve in mostly reportorial roles in its patient intake and care system. For instance, the RNs cannot assign staff to patients but rather must request the staff, subject to management's approval. The RNs can only recommend discipline or suspension of other employees and cannot resolve grievances of

LVNs or HHAs on their own—rather, they must request management to transfer the staff member to another patient. They cannot independently hire or terminate individuals, as those decisions rest with the branch managers and other senior leadership at Renew. At best, the RNs' exercise of any supervisory function is limited to a purely clerical or reportorial nature, which is insufficient to establish supervisory status. *See Ky. River Cmty. Care*, 523 U.S. at 713.

Thus, we conclude that the Board's determination that Renew's RNs are not supervisors under the Act is supported by substantial evidence. *See El Paso Elec. Co.*, 681 F.3d at 656. The ALJ appropriately discounted Criswell's and Thornwald's testimony that RNs had authority to discipline LVNs and HHAs because the "statements were wholly uncorroborated" by any "testimony of RNs who actually disciplined LVNs and HHAs and/or by documents memorializing such discipline." In line with its precedent, the Board rejected Renew's argument that state and federal regulations demonstrated that Renew's RNs had authority to supervise the unlicensed HHAs because "statutory schemes other than the NLRA cannot in and of themselves establish supervisory status under the NLRA." *Pain Relief Ctrs., P.A.*, Case 10-CA-260563, 2022 WL 580717, at *1 (N.L.R.B. 2022). The Board further held that the record was insufficient to show that the regulations applied to Renew's RNs. Therefore, we grant the Board's petition for enforcement as to this determination and continue to discuss the Board's holding that Renew violated § 8(a)(1).

### B. Unfair Labor Practices

Section 7 of the Act provides employees the "right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively," as well as "engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. The Supreme Court has made clear that § 7 applies to non-union employees because they must "speak for themselves as best they c[an]" without representation in the bargaining process. *NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 14 (1962). Section 8(a)(1) of the Act protects employees exercising their rights to organize themselves from unfair labor practices that chill this behavior. 29 U.S.C. § 158(a)(1). Here, the Board held that Renew conducted the following unfair labor practices: (1) maintaining an impermissible oral workplace rule, (2) threatening economic reprisals for engaging in concerted activity, (3) interrogating employees about concerted activity, and (4) unlawfully terminating an employee for engaging in protected activity. We address each determination in turn below.

### i. Oral Workplace Rule

An employer violates § 8(a)(1) when it institutes a workplace rule that forbids or discourages its employees from engaging in concerted conduct. *See Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 208–09 (5th Cir. 2014) (holding that a workplace rule preventing employees from discussing wage information violates § 8(a)(1)). To determine whether a rule violates the Act, a court must decide whether the employer's rule regulating workplace conduct chills a reasonable employee's exercise of their § 7 rights. *T-Mobile*

*USA, Inc. v. NLRB*, 865 F.3d 265, 270 (5th Cir. 2017). Precedent established by the Board and this court demonstrates that a rule must be communicated to multiple employees to constitute a § 8(a)(1) violation. *See, e.g.*, *St. Mary's Hosp. of Blue Springs*, 346 NLRB 776, 776–77 (2006) (determining that a supervisor's reprimand of one employee does not constitute a workplace rule).

Here, the Board determined that Renew maintained an impermissible workplace rule beginning in 2019 that "effectively bar[red] employees from discussing wages and workplace conditions amongst themselves." The Board held that Renew applied the rule in the August 2019 discipline plan when it "threaten[ed] Bornschlegl with further disciplinary action" if she continued to discuss workplace matters with her co-workers. It further stated that Renew's leadership enforced the rule after the April 16, 2020 videoconference by directing her to bring any workplace grievances to management because Renew's leadership "consider[ed] such behaviors . . . as an attempt to create a culture of discord or hostile work environment." The Board ascertained that "Renew again employed the rule when it fired Bornschlegl for failing to comply with her August 2019 discipline" plan. Ultimately, the Board concluded by holding that Bornschlegl's discipline could be reasonably construed as an unlawfully maintained workplace rule that prohibited protected conduct under the Act.

Our review, however, indicates that this holding contravenes Board precedent. The Board has consistently held that an employer's policy is only a workplace rule if it is communicated to more than one employee or

otherwise conveyed with instructions to disseminate the policy to other employees. *See, e.g.*, *Flamingo Las Vegas Operating Co.*, 360 NLRB 243, 243 (2014) ("[W]e do not find that the [employer] promulgated a rule because [the supervisor] directed his statements solely at [one employee] and they were never repeated to any other employee as a general requirement."). In its decision, the Board cited *Teachers AFT New Mexico* and briefly concluded that Bornschlegl's discipline could "reasonably be construed as establishing a new rule or policy for all employees.". In *Teachers AFT New Mexico*, the Board reversed the ALJ's determination that several statements made relative to a union election could be reasonably interpreted as a new workplace rule because "[t]he record fail[ed] to show that these statements . . . were communicated to any other employees or would reasonably be construed as establishing a new rule or policy for all employees." 360 NLRB at 438 n.3.

The Board thus failed to apply its controlling case law in holding that Renew maintained an impermissible workplace rule. Furthermore, none of the authority the ALJ cited in support of this determination involved a policy articulated to just one employee. *Cf. AFSCME Local No. 5*, 364 NLRB 837, 838–39 (2016) (declaring that a workplace rule issued in "a memorandum to all employees" violated § 8(a)(1)). The record confirms that Bornschlegl did not discuss the substance of her August 2019 discipline plan with other employees. Thus, we conclude that the Board's determination regarding the oral workplace rule lacks sufficient evidence in the record. We therefore deny enforcement of the Board's Order as to its oral workplace rule holding.

### ii. Impermissible Threat

We have held that an employer violates § 8(a)(1) where "under the totality of the circumstances . . . an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports" protected conduct. *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 n.3 (5th Cir. 2003). However, an employer does not violate § 8(a)(1) by the "expressing of any views, argument, or opinion . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). "The test for determining 'whether an employer has violated Section 8(a)(1) is whether the employer's questions, threats or statements tend to be coercive, not whether the employees are in fact coerced.'" *Id.* (quoting *NLRB v. PNEU Elec., Inc.*, 309 F.3d 843, 850 (5th Cir. 2002)). The analysis is framed from the perspective of the employee and is not contingent on "either the motivation behind the remark or its actual effect." *Miller Elec. Pump & Plumbing*, 334 NLRB 824, 824 (2001).

Here, the Board determined that "Thornwald's April 16 text message to Bornschlegl" was a threat that violated § 8(a)(1). In the text message, Thornwald said that the April 2020 telephone conference had gotten "a bit out of hand with negativity" and instructed Bornschlegl to raise any concerns to management "individually in order to avoid creating a morale problem." The Board stated that "[a] reasonable employee would understand the message as a threat of discipline or other consequences if she continued to discuss workplace concerns with her coworkers." Thus, it concluded that the

14

text message "threaten[ed] Bornschlegl with discipline if she discussed work matters with her fellow employees."

In its petition, Renew argues that Thornwald's message, viewed in context, was supportive and not a threat. It asserts that Thornwald sent this text in response to Bornschlegl's inquiries following the chaotic April 16, 2020 videoconference call. It further contends that the text could not have been interpreted as coercive or intimidating because Bornschlegl "openly discussed workplace issues with her co-workers after receiving" the message.

Although the fact that Bornschlegl continued to discuss workplace issues with her co-workers after receiving the alleged threat is irrelevant under our jurisprudence,[4] the ALJ's determination on this issue is far more conclusory as compared to his other holdings. Our deferential standard of review applies only when the Board engages in reasoned decision-making. *See Motor Vehicle Mfgs. Ass'n v. State Farm Mut. Auto. Inc. Co.*, 463 U.S. 29, 43 (1983); *see also Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638–39 (D.C. Cir. 2017). Without sufficient analysis, the Board's conclusory holding—that the text message could have been perceived to reference discipline or termination if she engaged in protected conduct—cannot be evaluated for its plausibility. *Cf. Standard Fittings Co.*, 845 F.2d at 1314 (holding that an ALJ's decision will stand "if a reasonable person could have found what the ALJ found"). We thus conclude that the Board's impermissible threat determination is not supported by substantial evidence and not entitled to

_____

[4] *See Brown & Root, Inc.*, 333 F.3d at 634 & n.3.

deference. Consequently, we will not enforce the Board's order as to the threat issue.

### iii. Coercive Interrogation

The Act prohibits employers from interrogating employees about their concerted activities if the questioning tends to coerce employees to refrain from exercising their rights under § 7 of the Act. *See UNF W., Inc.*, 844 F.3d at 461. To determine whether an interaction between an employer and employee constitutes a coercive interrogation, we examine "the totality of the circumstances in which the interrogation occurred." *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir. 1980). Importantly, the analysis "is whether the questioning tends to be coercive, not whether the employees are in fact coerced." *NLRB v. Varo, Inc.*, 425 F.2d 293, 298 (5th Cir. 1970). We consider the eight factors established in *Bourne v. NLRB*, 332 F.2d 47, 49 (2d Cir. 1964), when analyzing a coercive interrogation charge. *UNF W., Inc.*, 844 F.3d at 461. The factors are:

> (1) the background, or history of employer hostility and discrimination; (2) the nature of the information the questioner seeks; (3) the rank of the questioner in the company hierarchy; (4) the place and manner of the interrogation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals would be forthcoming should he or she support the union.

*Id.* We have found that these factors are "not a mandate for formalistic analysis," but function as "analytical guiding lights" in our inquiry. *Id.* We

further have stated that "[n]o single factor is determinative and coercive interrogation may still be found" even if the factors weigh in the employer's favor. *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 561 (5th Cir. 2003) (internal quotation omitted). Lastly, the Board is not required to apply each factor to each claim. *UNF W., Inc.*, 844 F.3d at 461–62.

The alleged violation occurred when Thornwald and Ray reached out to each employee named in the Kmail message to ask if they "were aware of the verbiage used" by Bornschlegl. Furthermore, the Board concluded that Ray's request to review the group text messages that led to the group Kmail at Bornschlegl's termination meeting violated § 8(a)(1) of the Act. The ALJ determined that, based on the totality of the circumstances, Thornwald's and Ray's authority to discipline and terminate employees—in conjunction with the tenor of their inquest into the employees' protected communications—crossed the line into coercive questioning. The Board affirmed the ALJ's conclusion because it agreed that while asking the employees if they had authorized Bornschlegl to list their names in the Kmail was a legitimate question, Renew's request to see the group text messages was nevertheless an unlawful attempt to chill or intrude on the employees' exercise of their § 7 rights to discuss workplace conditions.

Renew argues that the Board erred by using the five-factor test laid out by the Board in *Westwood Healthcare Ctr.*, 330 NLRB 935, 939 (2001) instead of the eight-factor *Bourne* test. *Fiber Glass Sys., Inc. v. NLRB*, 807 F.2d 461, 463 (5th Cir. 1987) (adopting *Bourne* factors). Renew further asserts that the Board incorrectly applied the law to the facts of this case in determining that

Renew historically treated Bornschlegl with hostility, that Ray's texts were not seeking generalized information, and that Renew's investigation went beyond permissible bounds. Renew also points to several cases where we have admonished the Board for incorrectly applying the *Bourne* factors to invalidate the Board's reliance on *Westwood*.

We again hold that Renew's arguments are unpersuasive. First, we do not require the Board to apply all eight *Bourne* factors. *UNF W., Inc.*, 844 F.3d at 461. Renew concedes that the Board applied the five *Westwood* factors to determine that it unlawfully interrogated its employees. Renew further recognizes that the *Westwood* factors are functionally the same as the first five *Bourne* factors. Furthermore, this court has only admonished the Board for holding that a § 8(a)(1) violation occurred without applying any of the factors or setting forth any bases for its determination that a coercive interrogation occurred. Renew's assertion that the Board ignored several factors is unsupported by the record. For instance, the Board determined that Renew's April 27, 2020 Kmail inquiry was not part of a valid investigation because it asked for protected information, which is the sixth *Bourne* factor. Thus, we hold that the Board's determinations that Renew unlawfully interrogated its employees are owed deference. *See Brookwood Furniture*, 701 F.2d at 464.

### iv. Unlawful Discharge

In reviewing an alleged § 8(a)(1) violation based on the unlawful termination of an employee, we apply the framework established by the Board in *Wright Line*, 251 NLRB 1083 (1980). *New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 600–01 (5th Cir. 2000). This

framework provides that "an employer's termination of an employee violates Section 8(a)(1) if the employee's protected conduct was a motivating factor in the decision to discharge the employee." *Cordua Rests. Inc. v. NLRB*, 985 F.3d 415, 423 (5th Cir. 2021). The employee's protected activity must be at least "a substantial or motivating factor," but need not be "the sole motivating factor." *Id.* (quoting *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 370 (5th Cir. 2017)). Where "the record does permit a competing, perhaps even equal, inference of a legitimate basis for discipline [or termination], the Board could reasonably infer an improper motivation." *NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923, 937 (5th Cir. 1993). Because motive is a fact question, we will not "lightly displace the Board's factual finding of discriminatory intent." *Brookwood Furniture*, 701 F.2d at 464.

Rather, courts afford "special deference" to the Board's holding "where, as here, conflicting evidence require[d] that essential credibility determinations be made." *Id.* The Board may rely on circumstantial evidence to infer that an employee's protected activity was a motivating factor in an employer's decision to terminate the employee. *Elec. Data Sys. Corp. v. NLRB*, 985 F.2d 801, 804–05 (5th Cir. 1993). This requires the employer to prove "as an affirmative defense, that the employer would have fired the employee even if the employee had not engaged in the protected activities" to avoid liability. *Cordua Rests.*, 985 F.3d at 423–24 (citing *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 313 (5th Cir. 1988)).

Renew argues that there was no evidence of animus against Bornschlegl in its questioning or investigation. It further asserted that it

would have fired Bornschlegl under its falsification policy regardless of whether she had engaged in protected conduct because it fired every employee that falsified client documents in violation of the policy. Renew further contends that the Board improperly distinguished Bornschlegl's termination for falsification from the previous instances of termination.

Once again, Renew misses the mark. The Board's factual determination of discriminatory intent is owed special deference. *Brookwood Furniture*, 701 F.2d at 464. The Board determined that Renew unlawfully terminated Bornschlegl based on her involvement in protected activity and that Renew's alleged justification for her termination was pretextual. In accordance with our precedent, the Board accepted the ALJ's credibility determinations based on conflicting evidence and testimony and held that discriminatory intent was present. *See Brookwood Furniture*, 701 F.2d at 464. The Board further rejected Renew's arguments that it would have terminated Bornschlegl for violating the falsification policy because the previous employees terminated under that policy had falsified timecards or visit logs rather than merely signing another employee's name to an internal email. Thus, the Board relied on sufficient evidence to determine that Bornschlegl's protected activity was at least a motivating factor in her termination. We therefore grant the Board's petition for enforcement as to its unlawful termination holding.

## IV.

In sum, we hold that the Board's determination that Renew's RNs are not statutory supervisors under the Act is supported by substantial evidence.

No. 22-60584

We further conclude that the Board's determinations that Renew violated § 8(a)(1) by conducting coercive investigations and unlawfully terminating Bornschlegl are also supported by substantial evidence. However, we hold that the Board's holdings that Renew violated § 8(a)(1) of the Act by issuing an impermissible oral workplace rule and by threatening Bornschlegl are not supported by substantial evidence considering existing Board precedent. Therefore, Renew's petition is GRANTED in part as to the Board's holdings that Renew instituted an impermissible oral workplace rule and impermissibly threatened Bornschlegl and DENIED in all other respects. The Board's cross-petition for enforcement is correspondingly DENIED in part and GRANTED in part.