# United States Court of Appeals for the Fifth Circuit

———————

No. 24-60651

———————

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2026

Lyle W. Cayce
Clerk

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

———————————————————————

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board
Agency Nos. 31-CA-299464,
31-CA-305504, 31-RC-296066

———————————————————————

Before SMITH, WIENER, and HIGGINSON, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Starbucks stores underwent a flurry of union organizing activity in 2022. This case arises from one such attempt where Starbucks employees sought to unionize in Sylmar, California. As the National Labor Relations Board ("NLRB" or "Board") tells it, what ensued was a campaign of coercive threats, interrogation, and unlawful firing. Because the NLRB's findings are a mix of supported and unsupported conclusions, review and enforcement are granted in part and denied in part.

No. 24-60651

## I.

The Board found that Starbucks, through managers Tiffany Fuller and Jennifer Tayarah, made coercive threats against Edison Sosa, David Ramirez, Barbara Pichardo, and Jason Untaran, all employees at the store at issue. The Board also found that Starbucks had coercively interrogated and unlawfully discharged Untaran.

### A. Sosa

Fuller met with Sosa in June or July 2022; Sosa asked about a letter Starbucks had posted. The letter stated that, though it announced a plan to increase pay and benefits in August, Starbucks was not permitted to "unilaterally change terms and conditions of employment in unionized stores or stores undergoing organizing activity." To that end, it limited the pay and benefit increases to stores where there had been no union activity before the first letter was sent.

Sosa asked Fuller what it meant to unionize. Fuller stated that "it would not be up to her, that whatever issues or questions the employees had would have to be up to the Union, so that she would not be able to do anything for them." Sosa brought up the letter, and Fuller stated that the benefits "would be put on pause" because the store was going through the unionization process. According to Sosa, Fuller also stated that "it would be up to the unionized representative to argue whether or not we would get those [benefits]." Sosa also stated that Fuller claimed that the new benefits "would be either added on, or not, based on if the Union representative would argue for that."

### B. Ramirez

Fuller spoke to Ramirez, the employee who had requested an election on union representation, and stated that Fuller was opposed to unionizing because of the "risks that she believed we [partners] would lose benefits."

2

No. 24-60651

Specifically, she said she was concerned about losing access to free tuition to Arizona State University and health benefits through union negotiations.

## C. Pichardo

Pichardo had a conversation with Fuller and Tayarah in which Pichardo asked them about their views on unionization. Before that conversation, Pichardo had discussed unionization with Fuller on four occasions. In the meeting with Tayarah and Fuller, Tayarah told Pichardo that unionizing the store "wouldn't change the world" and that "the Union wouldn't change better working conditions for [Pichardo]." Tayarah then stated that she understood why In-N-Out should unionize but not why Starbucks would. When Pichardo asked for better wages and working conditions, Tayarah told her "there are other jobs that do offer better pay."

## D. Untaran

### 1.

Fuller had a one-on-one meeting with Untaran on June 22 in the back of the house, where she asked him "how [he] felt about unionization." Fuller did not know about Untaran's views of the union at the time. Untaran responded by stating that he felt unionization would not be necessary if employees weren't overwhelmed with work and had more support. Fuller replied that voting for the union would not guarantee extra hours or more employees. In the same conversation, Fuller stated that access to free tuition, health benefits, and a pay bump were "going to be withheld during the time of negotiations."

### 2.

Starbucks and the NLRB have two distinctive renditions of the facts with regard to Untaran's discharge.

Starbucks claims it fired Untaran because of his poor behavior. He

3

arrived late to work and vaped in the store (violating company policy), claiming "nobody was . . . actually watching so it didn't matter." Team members also complained that Untaran neglected or actively resisted doing typical work such as cleaning, restocking, and other closing tasks. After multiple warnings—several verbal and one written—Starbucks terminated him on July 1, 2022.

The Board, on the other hand, asserts that Starbucks unlawfully discharged Untaran based on anti-union animus. The Board recounts the employees' months-long efforts to unionize starting in January 2022. Once the union filed its petition to represent the store's employees, Starbucks's managers began to speak individually with employees and seemingly to discourage unionization. On June 22, Fuller spoke to Untaran specifically about the petition—who, up to that point, had kept his union activity quiet. On June 28, Untaran joined employees at a coordinated union meeting at the store with Congressman Tony Cardenas. Four days later, Starbucks fired Untaran. The Board also claims that Starbucks treated other employees differently from Untaran, giving them more grace and warnings before termination.

### E. Procedural History

After the July election, a majority of employees voted against union representation. The union then filed objections on account of Untaran's termination and because of various statements by managers. The case went before an administrative law judge ("ALJ"), who ruled against Starbucks on four charges.

First, the ALJ found Starbucks violated the National Labor Relations Act ("NLRA") Section 8(a)(1) twice for statements by employers that unionization "wouldn't change the world" and that "there are other jobs that do offer better pay." Second, the ALJ found Fuller's statements rose to

the level of an unlawful threat in violation of Section 8(a)(1) when the manager told an employee that the changes in benefits would be put on hold during the election. Third, the ALJ found anti-union animus motivated (at least in part) Untaran's termination, violating Section 8(a)(1) and (3). This animus was "inferred" by the timing of Untaran's firing—just "four days after he met with the Congressman" and by Starbuck's treatment of allegedly similarly situated employees. Finally, the ALJ found Starbucks fell short of its burden to show it would have terminated Untaran absent the union activity.

The NLRB adopted some of the ALJ's conclusions and reversed others. The Board agreed that Starbucks violated Section 8(a)(1) when Fuller and Tayarah made comments that the benefits would be "on pause" during the election; the union "would not bring better working conditions"; and that other jobs would offer better pay. The Board also found Starbucks violated Section 8(a)(1) and (3) by firing Untaran for his union activity. The Board reversed the ALJ in part, further finding that Starbucks violated Section 8(a)(1) based on separate employer statements and the June 22 "coercive interrogation" of Untaran regarding his union support. Finally, the Board adopted the ALJ's remedies: reinstatement of Untaran, backpay, compensatory damages, and a new election. This petition for review and cross-petition for enforcement followed.

## II.

Starbucks asks this court to deny enforcement of the Board's entire order. In the alternative, it requests relief from the remedy of compensatory damages and a new election. Starbucks urges that the order of compensation violates the NLRA and the Constitution (Article III and Seventh Amendment). Starbucks also asks us to vacate the new-election remedy because of the allegedly "erroneous conclusion that Starbucks wrongfully discharged Untaran" and because a supermajority of employees voted against

unionization.

The judiciary has a limited role in reviewing the NLRB's decisions. We "affirm the Board's conclusions 'if they have a reasonable basis in the law and are not inconsistent with the [NLRA].'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018) (alteration in original)).

The Board's factual findings are conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). We ask whether "a reasonable person could have found what the ALJ found, even if this court may have reached a different conclusion." *Renew Home Health v. NLRB*, 95 F.4th 231, 239 (5th Cir. 2024). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Therefore, the Board must consider "contradictory evidence or evidence from which conflicting inferences could be drawn." *Id.* at 487.

## A. Section 8(a)(1) Coercion

The merits of the Board's conclusions regarding coercive threats are mixed. The conclusion that Untaran was coercively interrogated is supported by substantial evidence.

"An unlawful threat is established under Section 8(a)(1), if under the totality of the circumstances, an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports the union." *NLRB v. Delta Gas., Inc.*, 840 F.2d 309, 311 (5th Cir. 1988). An employer's predictions about the precise effect unionization will have on the company must "be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

No. 24-60651

1. Coercive Threats Against Sosa

The NLRB maintains that Fuller's conversation with Sosa contained a coercive threat. The Board cites *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir. 1970), for the proposition that "whenever the employer by promises or by course of conduct has made a particular benefit part of the established wage or compensation system, then [it] is not at liberty unilaterally to change this benefit either for better or worse during the union campaign or during the period of collective bargaining." *Id.* The Board further asserts that Starbucks alludes to but misunderstands the exception to that rule that allows employers to postpone expected wage or benefit increases to avoid the appearance of influencing the election's outcome.

Starbucks responds by urging that the NLRB misapprehends the issue. Starbucks states that neither the ALJ nor the Board points to evidence that the pay increase falls into the category of a regularly scheduled wage increase, dooming the Board's justification. Furthermore, Starbucks claims that the NLRB's approach, when considered with other NLRB precedents, puts an employer into an impossible bind, where pausing benefits means that they threatened employees, and, on the other hand, extending promised benefits results in a holding that the employer unlawfully interfered with the election.

The Board's conclusion that Fuller threatened Sosa is not supported by substantial evidence. As Starbucks rightly states, neither the Board nor the ALJ points to any authority that states that an announced, non-routine, and unimplemented benefit comes within the scope of an established wage or compensation system, nor does anything in the record support such a finding. The ALJ's asserted reasons are particularly problematic because the ALJ makes reference only to NLRB cases that deal with routine and regularly scheduled pay raises.

7

No. 24-60651

The quoted language in *Dothan Eagle* reaffirms that point: The rule applies only to the "*established* wage or compensation system." 434 F.2d at 98 (emphasis added). In justifying the rule, the court in *Dothan Eagle* emphasized that the wage-increase policy in question "was widely known and had been in effect for a considerable period of time. It had thus become part of the established scheme of compensation and could not be deviated from for purposes of influencing the vote." *Id.* at 99. Read in its proper context, *Dothan Eagle* makes it clear that the application of its rule should be to wage systems that are already in effect and that employees can justifiably rely on, something which both the Board and the ALJ failed to establish and the record does not support.

Nothing in the record ties the promised benefits, provided for in the Starbucks letter and subsequent clarification, to an already established system of compensation rather than a bespoke provision of increased benefits. The "simple but fundamental rule of administrative law that reviewing courts must judge the propriety of [agency] action solely by the grounds invoked by the agency" means that the Board's conclusion cannot stand.[1]

2. Coercive Threats Against Ramirez and Untaran

The NLRB asserts that its decision that Ramirez and Untaran were coercively threatened is supported by substantial evidence. It states that Fuller's message told the employees they would lose certain benefits through negotiation. In particular, it claims that Fuller's conversation with Ramirez involved an employer's making a prediction as to the precise effects it believes unionization will have. It cites *Gissel* for the proposition that any such predictions must "be carefully phrased on the basis of objective fact to con-

---

[1] *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (citation modified); *see also Tesla, Inc. v. NLRB*, 120 F.4th 433, 439 n.3 (5th Cir. 2024) (applying *Calcutt* to the NLRB).

vey [the] employer's belief as to demonstrably probable consequences beyond [its] control." 395 U.S. at 618. The NLRB concludes by claiming that Fuller suggested that Starbucks would adopt a punitive bargaining strategy, as distinguished from the permissible act of emphasizing the give-and-take of collective action.

As to Untaran, the NLRB asserts that the Supreme Court has long held that a unilateral refusal to maintain existing wage and benefit policies during the collective bargaining period is unlawful. It further contends that both statements constitute violations, even if they were framed as possible outcomes, because employees perceive a threat if there is any implication that an employer may retaliate.

For its part, Starbucks contends that Fuller's statements to Ramirez were not coercive because the Board, in reversing the ALJ, took statements from management that emphatically assert a risk and twisted them into claims of absolute certainty. Starbucks further emphasizes that Fuller stated that these benefits could be lost "through negotiations" and that this statement indicates that Fuller was attempting to explain nuances, not threatening reprisal, meaning no reasonable factfinder could conclude that Fuller threatened reprisal against Ramirez.

Starbucks further contends that Untaran gave two conflicting accounts of Fuller's statements about benefits, stating both that certain benefits "were possibly going to be withheld . . . during the negotiations for contracts with Starbucks and the Union" and that "all of that *was going to be* withheld during the time of negotiations." Starbucks continues by claiming that all that Fuller communicated was that Starbucks was permitted to extend benefits to nonunionized employees while withholding them from unionizing employees during bargaining.

Starbucks concludes by asserting that the Board erred by failing to

consider the fact that Fuller's statements did not chill Untaran's union activity. Starbucks acknowledges that actual coercion is unnecessary, but it still asserts that an employee's subjective response can help determine whether a reasonable employee would tend to be coerced.

### a. Ramirez

The Board's decision on Ramirez is supported by substantial evidence because Fuller's statement left sufficient ambiguity as to Starbucks's position. As the Board ably pointed out, it is irrelevant whether Fuller used "could" versus "would" when she talked to Ramirez. Instead, if, under the totality of the circumstances, a reasonable employee could have conceived of Fuller's statement as a coercive threat then there has been a violation. Although Fuller's statement could be plausibly understood as highlighting the give-and-take of negotiation, her statement that the benefits could be lost "through negotiation," paired with reference to benefits that were wholly in Starbucks's control could be reasonably interpreted as a suggestion that Starbucks was going to take a punitive bargaining position by threatening those benefits. Under the substantial evidence standard, that is sufficient to uphold the Board's decision.

### b. Untaran

The NLRB's finding as to Untaran is supported by substantial evidence. Fuller's statements to Untaran can be understood by a reasonable employee, aware of all of the facts and law, as a coercive threat because the statement, even if it was probabilistic, still proposed unlawful conduct.

As previously stated, *Dothan Eagle* stands for the proposition that it is unlawful to fail to maintain existing wage and benefit policies during a union election period. The tuition and health benefits were part of existing wage and benefit policies, as the programs were already established and the benefits conferred upon Starbucks employees. Therefore, Starbucks would

have had no right to withhold those benefits during negotiations. If Fuller was referring exclusively to the new increases to those programs promised in the letter, Untaran's credited testimony does not make that clear.

Starbucks does little to respond, claiming only that Fuller "merely explained that Starbucks was under no obligation to extend an unimplemented pay bump during a union election." Starbucks's failure to respond to Fuller's statements about tuition and health benefits is telling. Even assuming *arguendo* that we would take Untaran's subjective impression into account, that cannot overcome the deference owed under the substantial-evidence standard, especially given that Fuller's statement plausibly communicated that Starbucks would violate the law in response to union activity.

### 3. Coercive Threats Against Pichardo

The NLRB asserts that there is substantial evidence to support the Board's finding that Tayarah's statements to Pichardo constituted coercive threats. The ALJ stated that Tayarah's statement that the union wouldn't improve working conditions was the same as stating that union representation would be futile and that her statement that there were other jobs implied that support for the union was incompatible with continued employment. The NLRB highlights that a warning of futility of organization constitutes a violation of Section 8(a)(1). It maintains that Tayarah's statement signified that Starbucks would refuse to provide the increased support that Pichardo sought.

In response, Starbucks points to *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003), for the proposition that a statement of futility violates Section 8(a)(1) only if it is accompanied by a threat that the employer will do something to make union support futile. Starbucks reasons that Tayarah's statements contained no such independent threat and cannot qualify as a violation under Section 8(a)(1). Starbucks continues by claiming

that Tayarah's acknowledgement that other jobs pay better was not a threat and that the Board's reading of its caselaw is a *per se* rule that is counter to this court's precedent, which focuses on contextual analysis, not a "magic-words" rule. Starbucks concludes by arguing that the cases cited by the NLRB all involved direct invitations to quit or statements threatening discharge, neither of which Tayarah did.

The Board's decision on futility is not supported by substantial evidence, but its decision on Tayarah's other statement is.

As for the futility argument, Starbucks is correct that *Brown & Root* controls. *Brown & Root* stated that "this Court has only found comments to be unlawful statements about futility when accompanied by a threat or implication that the employer will take some action to render union support futile." 333 F.3d at 634. That observation determines the outcome here.

Tayarah's assertion that the union wouldn't improve working conditions is a statement of futility, but there is nothing that indicates that it was accompanied by a threat that Starbucks itself would do something to render support futile. Siding with Pichardo on Tayarah's other statement does not change this analysis because a reasonable person could find only that the threat was not a threat to make employees' "selection of a bargaining representative . . . futile" so much as it was a threat of economic reprisal against Pichardo for her union support. A reasonable person could not conclude what the Board announced, so the ruling lacks substantial evidence.

Regarding Tayarah's statement that there were other jobs that offered better pay, there is substantial evidence to support the Board's conclusion.[2]

_____

[2] That being said, the NLRB seems to want to have it both ways, relying on Pichardo's subjective understanding of Tayarah's statements while disclaiming our ability to do so in the case of Untaran. This court has not acknowledged the relevance of an employee's subjective understanding to a Section 8(a)(1) violation, and there is no reason to do so in

Although the rule from the Board's caselaw that finds a Section 8(a)(1) violation anytime an employer with the power to fire responds to union support with an invitation to quit sweeps too broadly, such circumstances can often withstand substantial-evidence review absent countervailing facts. Pichardo had four previous conversations concerning the union with Fuller before the meeting with Fuller and Tayarah, two of which involved criticism of unionization. With those conversations as background, Tayarah's negativity toward unionization, and the fact that the statement in question was directly in response to a request for better wages and working conditions, a reasonable employee could conclude that Tayarah was threatening economic reprisal for union support, namely threatening to terminate Pichardo's employment.

### 4. Coercive Interrogation Against Untaran

"To determine whether an interaction between an employer and employee constitutes a coercive interrogation, we examine 'the totality of the circumstances in which the interrogation occurred. The relevant inquiry is whether the questioning tends to be coercive, not whether the employees are in fact coerced." *Apple*, 143 F.4th at 297 (citation modified). We consider eight factors when analyzing whether an interrogation was coercive:

> (1) the background, or history of employer hostility and discrimination; (2) the nature of the information the questioner seeks; (3) the rank of the questioner in the company hierarchy; (4) the place and manner of the interrogation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals would be forthcoming should he

———————————————

this case. *See also Apple*, 143 F.4th at 299 n.26.

or she support the union.

*Renew Home Health*, 95 F.4th at 243 (citation modified).  These factors are an analytical guide, and no single factor is determinative.  *Id.* at 244.  Coercion can be found even where most of the factors favor the employer.  *Apple*, 143 F.4th at 298.

The ALJ originally held that Fuller's questioning of Untaran was not a coercive interrogation because Untaran answered truthfully, Fuller was a first-line supervisor, the conversation occurred in a public area, there was no history of employer discrimination at this particular store, and Fuller did not follow up with any coercive statements.  The Board reversed, finding that (1) the conversation took place in the midst of Starbucks's hostility toward employees, (2) Fuller made unlawful threats, (3) Fuller sought information "about core Section 7 rights," (4) Fuller was Untaran's direct supervisor, (5) the back of house was an "especially coercive" place to interrogate considering that's where disciplinary meetings and Untaran's firing occurred, (6) Untaran did not reply to Fuller's question completely candidly, and (7) Fuller did not provide Untaran with any assurances that his answers would not be used against him.  On appeal, the NLRB largely reiterates those points, adding a series of examples from both inside and outside this circuit to bolster its claims.

In comparison, Starbucks, relying on its claims from earlier, contends that Fuller made no statements threatening economic reprisal.  Starbucks further posits that the information that Fuller sought was innocuous and general, given that Fuller did not probe Untaran's voting intentions, follow up on Untaran's answer, or otherwise continue the purported interrogation.  Starbucks continues by claiming that the Board's point that Fuller was a direct supervisor improperly skews that factor against the employer in every case because supervisors are involved in nearly every case of alleged interro-

gation. Starbucks moreover asserts that the Board identified no evidence that the back-of-house was an area that the employees would be intimidated by and claims that the Board ignored the casual nature of the conversation. It closes by pointing out that the ALJ found that Untaran answered the question truthfully, that Fuller had a proper purpose of exercising Starbucks' right to discuss unionization with employees, and noting that a failure to disclaim reprisal alone cannot support a section 8(a)(1) violation.

The Board's decision is supported by substantial evidence. First, the NLRB is wrong to insist that asking about union support is *always* moderately coercive. As this court stated in *Apple*, the Board's "claim that inquiries about wages or union sentiment are quintessential example[s] of coercive interrogation sweeps too broadly." *Apple*, 143 F.4th at 299 (citation modified). As with the employer in *Apple*, Starbucks did not commit itself to a series of interrogations of a variety of employees; instead, this was a one-off conversation. Unlike in *Apple*, however, the supervisor here had plausibly displayed anti-union sentiment and proceeded to make a statement that could be perceived as an unlawful threat of withholding benefits in the same conversation, according to Untaran.[3]

Second, because Fuller did, in fact, make a statement that could be perceived as a threat by a reasonable employee, there is some support for a claim of hostility in the workplace. But one violation of the NLRA does not lend the same credence or support for a coercive interrogation when com-

---

[3] There is arguably some daylight between finding a violation of Section 8(a)(1) and evidence of anti-union sentiment. Because a Section 8(a)(1) violation is taken from the vantage point of a reasonable employee, it need not say anything about the employer's actual sentiment toward a union. *See Renew Home Health*, 95 F.4th at 242 ("The analysis is framed from the perspective of the employee and is not contingent on either the motivation behind the remark or its actual effect." (citation modified)).

pared to the example provided by the NLRB.[4]  Although Fuller had many conversations with employees about unionization and frequently expressed her skepticism about unionization, those actions, standing alone, are far weaker evidence of hostility.

Third, the rank of the questioner favors the NLRB's interpretation. As Starbucks itself acknowledges, this consideration matters where, among other things, the supervisor paired his or her questions "with threats of reprisal." Because we found against Starbucks on the issue of coercive threats with regard to Untaran, this issue is relevant and favors the NLRB's interpretation, as Fuller was the highest-ranking individual at the store.

Fourth, the location favors Starbucks:  The NLRB's description of the back-of-house is belied by the evidence, especially as to Untaran.  The back of the house was where Untaran broke Starbucks rules and vaped, and the ALJ described it as a "public place," a point the Board does not reject.[5]   The Board's characterization of the back of the house as an intimidating is based on a claim that that is where Fuller holds disciplinary meetings, but it does not engage with contrary evidence that indicates that Untaran felt comfortable in the back of the house, nor does the Board point to any evidence that suggests that, at the time of the conversation, Untaran, in particular, would have been intimidated by the location.

Fifth, Starbuck's defense of Fuller's purpose falls apart when the employer's intention is unclear, as is the case here.  In *Delco-Remy Division,*

---

[4] *See, e.g.*, *NLRB v. Birdsall*, 487 F.2d 288, 291 (5th Cir. 1973) ("In view of the totality of the circumstances surrounding the *systematic interrogations* of employees regarding their union sympathies the Board could properly conclude that the employer violated § 8(a)(1) of the Act.").

[5] *See Apple*, 143 F.4th at 298 (finding no coercion when, amongst other points, interrogation occurred in a public place.).

No. 24-60651

*General Motors Corp. v. NLRB*, 596 F.2d 1295, 1311 (5th Cir. 1979), we said that no statement of purpose or assurance that there would be no reprisal was required "when it is apparent from the circumstances . . . that the interrogation is for an innocent purpose and that the questions do not otherwise convey a veiled threat of reprisal." *Id.*

The situation described in *Delco-Remy* is different from the one in which Untaran found himself, given that Fuller's question about Union support was bracketed by a statement acknowledging the filing of a unionization petition and the importance of voting on that petition, on the front end, and what could be reasonably construed as a threat of economic reprisal via withheld benefits, on the back end. Under such circumstances, the failure to reassure the employee of an innocent purpose or a lack of retaliation is relevant and favors the NLRB's interpretation.

Sixth, the truthfulness of Untaran's reply cuts in favor of Starbucks, as he was not particularly evasive in his answer. Though the Board accurately points out that Untaran's answer is not "completely candid," insofar as he does not answer the question "how do you feel about unionization" directly and stridently, the fact that his answer still provided Fuller with some indication that he supports the union cuts against a finding of a coercive interrogation, though it is not dispositive on that point.[6]

There is substantial evidence to support the Board's conclusion. Though there are factors that cast doubt on its analysis, those factors are not so detrimental to render it impossible for "a reasonable person [to find] what

---

[6] *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 367–68 (5th Cir. 1990) ("While it is true that Brookshire was conducting the interviews on its own premises and that its employees answered the questions truthfully, it does appear that there was substantial evidence to support the Board's finding that Brookshire had coercively interrogated its employees . . . .").

No. 24-60651

the ALJ found." *Renew Home Health*, 95 F.4th at 239.

### B. Untaran's Termination for Union Activity

The Board erred in concluding that Starbucks terminated Untaran's employment for union activity. Starbucks asserts that the ALJ's conclusion regarding animus and the ALJ's finding that Starbucks wouldn't have terminated Untaran without animus lack substantial evidence. Starbucks is correct that the ALJ's animus determination lacks substantial evidence.[7]

To succeed in proving that an employee was unlawfully terminated under Section 8(a)(1) "the General Counsel must show, by a preponderance of the evidence, that [1] the employee was engaging in protected activity, [2] the employer had knowledge of the activity, [3] adverse action was taken against the employee, and [4] the activity was a motivating factor in the decision to discharge the employee." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 320–21 (5th Cir. 2013). The company may then prove an affirmative defense that it would have fired the employee regardless of the protected activity. *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 423–24 (5th Cir. 2021).

"For an adverse employment decision to constitute unlawful discrimination under section 8(a)(3), anti-union animus must be shown to have been a motivating factor in the employer's decision." *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 565 (5th Cir. 2003). Though, in the Fifth Circuit, a "section 8(a)(1) violation does not require a showing of anti-union animus" because the ALJ advances that theory only with respect to the *prima facie* case and the Board does not explicitly modify that, we are bound to decide this part of the case on that basis.[8]

---

[7] We decline to reach the subsidiary issue of whether the ALJ erred in finding that Starbucks wouldn't have terminated Untaran absent anti-union animus.

[8] *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001); *see generally id.*

No. 24-60651

The ALJ focused exclusively on the timing of the discharge and the treatment of comparators when determining that anti-union animus existed for purposes of the *prima facie* case.  The ALJ's analysis cannot support a finding against Starbucks because his comparator analysis is faulty and without it, the ALJ's conclusion relies exclusively on timing in contravention of our decision in *Arkema*.  "[A]n inference of union animus based upon disparate treatment can be made if the *only difference* between two differently treated employees is the illegitimate criteria at issue (i.e., union activity)." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996) (citation modified).  The comparators picked out by the ALJ do not fit that criterion.

The ALJ claims that AP received "two consecutive final warnings, then two consecutive written warnings" before being fired, contradicting Tayarah's and Fuller's claim that termination was required after a final written warning.  That was wrong, because AP was terminated after one final warning, something that the NLRB now acknowledges.  Additionally, the actual conduct in question differed as well.  At the bare minimum, it is undisputed that Untaran vaped in the back of the store on two separate occasions, was tardy twice, and had to receive verbal coaching on June 13.  In comparison, AP had several tardies, two dress code violations, and an argument with a coworker before termination.  The tardies are obviously similar in kind, but whether two dress code violations and an argument with another employee equal two violations of the tobacco policy and a verbal coaching is far from obvious;  the ALJ did nothing to explain away those differences.

Those differences make AP a poor fit as a comparator because the only difference between her and Untaran is not the illegitimate criterion of

_____

(collapsing a section 8(a)(1) and 8(a)(3) analysis); *Calcutt*, 598 U.S. at, 624 ("It is 'a simple but fundamental rule of administrative law' that reviewing courts 'must judge the propriety of [agency] action solely by the grounds invoked by the agency.'").

union activity. Additionally, the use of AP as a comparator undermines the notion that the timing of Untaran's firing was suspect, as the time between firing and those infractions cited in the notice of separation was two to three weeks, a timeframe similar to Untaran's firing.

As to NQ, she received a written warning for insulting her coworkers multiple times on the same day; she had previously been coached with relation to the mobile devices policy. Unlike both AP and Untaran, NQ did not engage in an extensive pattern of poor behavior; instead, the primary violation occurred on a single day. *Id.* Consequently, there are differences between NQ and Untaran other than the illegitimate criterion of union activity, making the ALJ's reliance on NQ inappropriate. All of those facts are sufficient to justify discounting the ALJ's comparator analysis.[9]

The Board's defense of the disparate-treatment justification is unavailing for reasons already discussed, and its insistence on the importance of timing fails because the ALJ's comparator analysis fails. As we stated in *Arkema*, 710 F.3d at 323, "timing alone . . . is not substantial evidence." Because the record does not support the use of either comparator, the only portion of the analysis that remains as a basis for concluding that the ALJ's finding was supported by substantial evidence is the timing of Untaran's discharge. Because such a finding is insufficient without more, the ALJ's decision regarding Untaran's termination cannot stand.

Lastly, footnote five of the Board's opinion cannot save its decision. Footnote five states, in response to a request by the General Counsel to overrule a case, that because "there is ample direct evidence of respondent's ani-

---

[9] *See Dish Network Corp. v. NLRB*, 953 F.3d 370, 377 (5th Cir. 2020), as revised (Mar. 24, 2020) ("Even if that conclusion could be supported by the portions of the record cited by the Board, we held the Board lacked substantial evidence merely because it failed to grapple with countervailing portions of the record.").

mus as to employee Untaran's union activity—there is no need to resort to a pretext analysis in determining whether animus is present." That conclusion is bereft of analysis of what the direct evidence of anti-union animus is or how that direct evidence demonstrates anti-union animus; it still provides no evidence that either the Board or the ALJ relied on Section 8(a)(1) in inferring animus; and lastly it is actually focused on a pretext analysis, something that the ALJ scarcely engaged with. *See Electrolux Home Prods., Inc.*, 368 NLRB No. 34 (2019). The ALJ's determination was not supported by substantial evidence, so enforcement is denied.[10]

### III. Union Election Remedy

The NLRB avers that we do not have jurisdiction to review its order for a second election. It is correct.

"[T]he NLRA provides only for judicial review of 'final orders' of the Board in unfair labor practice cases. Though consolidated for hearing with an unfair labor practice proceeding, the Board's decision in the representation proceeding does not constitute a final order." *NLRB v. Great W. Coca-Cola Bottling Co.*, 740 F.2d 398, 405 (5th Cir. 1984). *Great Western Coca-Cola Bottling Company* controls the outcome here, given that No. 31-RC-296066 was a representation action that was consolidated. That is why the Board severed the case and remanded it for a second election. Starbucks's reply to this point is that we should "reexamine" these conclusions, but such a reexamination is proper only before the en banc court. Although we are without jurisdiction to consider this issue, Starbucks will be able to seek review if a future order of the NLRB compels it to bargain after the

---

[10] Because enforcement is denied as to Untaran's wrongful-discharge claim, we need not address the issue of *Thryv* remedies.

No. 24-60651

second election.[11]

Conclusion

We GRANT the NLRB's request for enforcement as to one of the claims of coercive threats against Pichardo, the claim of a coercive threat against Untaran, and Untaran's unlawful interrogation claim because they are supported by substantial evidence. We DISMISS the appeal of the NLRB's order of a second election for want of jurisdiction and DENY enforcement of the NLRB's order as to Untaran's unlawful discharge claim and Sosa's and Ramirez's coercive threat claims as not supported by substantial evidence.

_____

[11] *Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964). ("Such decisions, rather, are normally reviewable only where the dispute concerning the correctness of the certification eventuates in a finding by the Board that an unfair labor practice has been committed as, for example, where an employer refuses to bargain with a certified representative on the ground that the election was held in an inappropriate bargaining unit.").